## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                                            Case No. 3:14-bk-30921-SHB
CHARLES M. JONES, III                       Chapter 7

                    Debtor

        CARL LANSDEN,
        CARL H. LANSDEN, and
        ROBERT H. CASH

                    Plaintiffs

            v.                              Adv. Proc. No. 3:14-ap-3048-SHB

        CHARLES M. JONES, III

                    Defendant


## M E M O R A N D U M

**APPEARANCES:**    WINCHESTER, SELLERS, FOSTER & STEELE, P.C.
                    Walter N. Winchester, Esq.
                    Joshua R. Holden, Esq.
                    Post Office Box 2428
                    Knoxville, Tennessee 37901-2428
                    Attorneys for Plaintiffs

                    MOSTOLLER, STULBERG, WHITFIELD & ALLEN
                    Ann Mostoller, Esq.
                    Tracey Vought Williams, Esq.
                    136 South Illinois Avenue
                    Suite 104
                    Oak Ridge, Tennessee 37830
                    Attorneys for Defendant


**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the Court on the Complaint to Determine

Nondischargeability of Debt filed by Plaintiffs on August 28, 2014, as amended on July 10, 2015

(collectively referred to as "Complaint"), seeking a judgment against Defendant in favor of

Plaintiff Carl Lansden ("Carl Lansden" or "Carl") in the amount of $933,258.38, in favor of

Plaintiff Robert Cash ("Butch Cash" or "Butch") in the amount of $143,848.19, and in favor of

Carl Hugh Lansden ("Hugh Lansden" or "Hugh") in the amount of $199,429.83; pre- and post-

judgment interest; costs of collection including attorneys' fees and expenses; punitive damages

in the amount of $1,000,000.00; and a determination that such judgment is nondischargeable

under 11 U.S.C. § 523(a)(2)(A).

The trial of this adversary proceeding was held over ten days on June 28 through July 1;

August 8 through 10; August 15 through 16; and August 19, 2016.  The record before the Court

consists of 329 exhibits admitted into evidence, including the deposition testimony of three

witnesses (Tim Bero, Steven Barborini, and Scott Braum) and the live testimony of nine

witnesses:  Larry Belk, Butch Cash, Robert Keith Cash ("Keith Cash" or "Keith"), Defendant,

Carl Lansden, Hugh Lansden, Margarette Lon-Britton, Stephen Moseley, and Grace Phillips.

Following the trial, the Court directed the parties to file proposed findings of fact and

conclusions of law and post-trial briefs.  Both Plaintiffs and Defendant filed their initial

documents on September 23, 2016 [Docs. 83 ,84], followed by responses thereto on October 28,

2016 [Docs. 85, 86].

## I. ISSUES

As set forth in the Joint Pretrial Statement filed by the parties, Plaintiffs' issues are stated

as follows:

[1] [w]ith regard to the Finance Agreements executed by the Plaintiffs from 2005 to
2009, whether such debts were obtained by false pretenses, a false representation or

actual fraud, given [Defendant]'s failure to disclose (a) the illegal nature of his business vis-à-vis the importation of illegal machinegun barrels, and (b) that he intended to use the Plaintiffs' funds to engage in illegal activities, thereby making such debts nondischargeable;

[2] [w]ith regard to the Inventory in Satisfaction of Debt Agreement [("ISDA")], whether [it] was procured by false pretenses, a false representation or actual fraud, given [Defendant]'s failure to disclose that the purportedly unencumbered inventory described therein was:

    (i) [f]or the material located in [the Foreign Trade Zone] #120 [("FTZ")], impressed with a lien in favor of the proprietor of the [FTZ] for unpaid bills, fees and expenses of which [Defendant] was fully aware;

    (ii) [f]or the material located in Hungary, subject to the liens and claims of ARMACO [Trading, Ltd. ("ARMACO")] for unpaid bills, fees and expenses of which [Defendant] was fully aware; and

    (iii) [f]or all inventory and materials, wherever located, subject to the blanket UCC-1 financing statement in favor of Citizens National Bank [("Citizens")] of which [Defendant] was fully aware, thereby making the debts referenced in [the ISDA] nondischargeable[;]

[3] [w]hether the Plaintiffs are entitled to entry of a money judgment against [Defendant];

[4] [w]hether the Plaintiffs are entitled to the recovery of their attorney's fees and court costs; and

[5] [w]hether the Plaintiffs are entitled to the recovery of punitive damages.

Defendant presented the issues as follows:

[1] [w]hether the Finance Agreements executed by the Plaintiffs from 2005 to 2009 were obtained by false pretenses, a false representation or actual fraud; [*sic*] and therefore, any remaining debt would be nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A)[;]

[2] [w]hether the [ISDA] was procured by false pretenses, a false representation or actual fraud; [*sic*] and therefore, rendering the debt nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A)[;]

    (i) [w]hether the inventory located in FTZ #120 transferred to the Plaintiffs under the [ISDA] was impressed with a possessory lien in favor of the proprietor of the [FTZ] for unpaid bills, fees and expenses thereby rendering the debt nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A)[;]

(ii) [w]hether the Defendant knew of any lien or claim by the [FTZ] prior to the execution of the [ISDA][;]

(iii) [w]hether the inventory located in Hungary, transferred to the Plaintiffs under the [ISDA] was the subject of any liens and claims of ARMACO for unpaid bills, fees and expenses, thereby rendering the debt nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A)[;]

(iv) [w]hether the Plaintiffs knew of the demilling cost associated with the inventory located in Hungary prior to the execution of the [ISDA];

(v) [w]hether the blanket UCC-1 financing statement, that secured a lien in the amount of $730,000.00 in favor of Citizens National Bank prohibited [Tennessee Guns International], in the ordinary course of business, from transferring or selling inventory, wherever located, thereby rendering the debt nondischargeable under 11 U.S.C. §523(a)(2)(A)[;]

[3] [w]hether the Defendant is personally liable to the [Plaintiffs] for the Finance Agreements executed by the Plaintiffs from 2005 to 2009[;]

[4] [w]hether the Defendant is personally liable to the [Plaintiffs] for the Finance Agreements and the [ISDA][;]

[5] [w]hether the Plaintiffs assumed the risk associated with entering into the [ISDA][;]

[6] [w]hether the Plaintiffs are entitled to recovery of their attorney's fees and court costs[;]

[7] [w]hether the Plaintiffs are entitled to recovery of punitive damages[; and]

[8] [w]hether the Defendant is entitled to recovery of his attorney's fees and court cost.

[Doc. 75.]

Because the parties stated the issues differently, at the beginning of the trial, the Court

summarized the issues as follows:  (1) whether the Finance Agreements executed by Plaintiffs

from 2005 to 2009 were obtained by false pretenses, a false representation, or actual fraud such

that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A); (2) whether the ISDA was

procured by false pretenses, a false representation, or actual fraud such that the debt is

nondischargeable under 11 U.S.C. § 523(a)(2)(A); and (3) whether Plaintiffs are entitled to a

money judgment against Defendant and whether any such money judgment should include

attorneys' fees, court costs, and/or punitive damages.  The parties agreed with the Court's

restatement of the issues.  Interwoven with these issues summarized by the Court are (1) whether

the corporate veil may be pierced or whether the "receipt of benefits" theory applies to hold

Defendant individually liable under the various Finance Agreements and/or the ISDA and (2)

whether Plaintiffs assumed the risk under the ISDA.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the Court has

jurisdiction to hear and decide this adversary proceeding under 28 U.S.C. §§ 157 and 1334, as

well as the general order of reference entered in this district.  This memorandum constitutes the

Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy

Procedure 7052.

## II. SUMMARY OF DECISION

After engaging in an extensive review of the record, including creation of a chronology

covering more than 20 years and containing 487 separate entries based on the 329 exhibits and

the trial testimony, the Court finds as follows:

(1) the Finance Agreements entered into between Plaintiffs and TG International, Inc.

("TGI") and/or MP International, Inc. ("MPI") from 2005 to 2009 were not obtained through

false pretenses, false representations, and/or actual fraud such that any amounts due thereunder

that were not otherwise re-obligated in the ISDA, to the extent that Defendant might have been

personally liable on the original obligations, were discharged on March 16, 2015;

(2) Defendant executed the ISDA both in his individual capacity and on behalf of TGI, and he received a direct benefit from execution and implementation of the ISDA such that he is personally liable to Plaintiffs for any breach of the ISDA;

(3) the ISDA was not procured through false pretenses, false representations, and/or actual fraud with respect to the FTZ Inventory (as defined *infra*), such that any obligations due from any default thereunder concerning the FTZ Inventory were discharged on March 16, 2015;

(4) the ISDA was procured through false pretenses, false representations, and/or actual fraud of Defendant with respect to the ARMACO Inventory (as defined *infra*), and the obligations due from the default of the ISDA concerning the ARMACO Inventory were not discharged on March 16, 2015;

(5) pursuant to the ISDA, Plaintiffs are entitled to recover their attorneys' fees and court costs incurred in connection with enforcement of the ISDA in the amounts of $100,000.00 paid to John Lucas and an amount to be determined for the services of Winchester, Sellers, Foster & Steele, P.C., which amounts are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

(6) Plaintiffs are not entitled to attorney's fees in the amount of $7,000.00 paid to Matthew Cook because they were not incurred to enforce the ISDA; and

(7) Plaintiffs are not entitled to punitive damages against Defendant.

## III. FACTS

### A. The Parties

Defendant graduated from the University of Tennessee in 1991 and started Tennessee Guns Corporation in the mid-1990s.  In the early 2000s, he obtained a firearms license with the United States Department of State and the federal Bureau of Alcohol, Tobacco, and Firearms (the "ATF") and began importing for sale weapons and ammunition, including surplus military

5

assault rifles.[1]   In 2001, Defendant purchased all shares and took sole ownership of Tennessee

Guns Corporation, the assets of which were subsequently purchased in 2003 by TGI, which,

since 2005, has been owned by MPI.  Both TGI and MPI are Tennessee corporations.

At all relevant times, Defendant was the sole shareholder of MPI (and of TGI, until MPI

purchased his TGI shares in 2005), and he served as the president of both from the dates of

incorporation until December 10, 2013, when he relinquished his ownership and operational

control in both companies.  Defendant's primary role with TGI was sales, and his sister, Grace

Phillips, who served as secretary and Chief Operations Officer, handled the day-to-day

operations.[2]  As of the trial date, TGI was still "technically" in business.

Defendant met Keith Cash in 2002 or 2003, and Keith subsequently introduced

Defendant to Plaintiffs.  Keith Cash became interested in firearms manufacturing, and he held

three federal firearms licenses ("FFLs"):  to manufacture ammunition, to manufacture firearms,

and to import weapons.  Keith was the sole owner of Waffen Werks, a company formed in 2002

that assembled firearms and imported materials from Europe and the Middle East.  TGI was

Waffen Werks's biggest client, with Waffen Werks assembling parts kits and firearm

components imported by TGI into working firearms to be sold by TGI in the United States.

Waffen Werks was a wholesale company and ceased doing business in 2014, after which Keith

Cash terminated his FFLs.  He and his spouse subsequently started a consulting business called

United Defense Consultants, LLC, and he again obtained and at the time of trial possessed FFLs

to manufacture firearms and import weapons.

---

[1] Defendant explained that surplus guns can be new or pre-used, functioning or non-functioning, and fully assembled or not assembled.

[2] Grace Phillips testified that she resigned as Chief Operations Office in March 2014, but she is still secretary of TGI pending resolution of this adversary proceeding.  MPI paid her salary.

Carl Lansden testified that he learned of the TGI investment opportunity through his great-nephew, Keith Cash. The funds that Carl loaned to TGI came from his personal investments and family savings. Carl does not possess a FFL and is not engaged in the firearms business. Carl was the first of Plaintiffs to loan to TGI, in June 2005 [*see* Trial Ex. 39], in part to help Keith, who received a benefit from the relationship between TGI and Waffen Werks. For that reason, initial contracts between Carl Lansden and TGI included a provision requiring that Waffen Werks would be the manufacturer of the firearms purchased with proceeds of Carl's loans to TGI. Carl testified that he did not meet Defendant in person until 2009.

Shortly after Carl made his first loan to TGI, Butch Cash (Carl's nephew and Keith's father) also made his first loan to TGI. [*See* Trial Ex. 5.] Like Carl, Butch does not possess a FFL and is not engaged in the firearms business. He funded Waffen Werks to help his son "make a living." Also like Carl, one of the main purposes of his agreeing to make loans to TGI was to assist Keith and Waffen Werks, which were to receive work from TGI in connection with TGI's importation of firearms parts purchased with proceeds of Butch's loans to TGI.

Hugh Lansden (Carl's son and Keith's second cousin) rehabs old houses for resale. He learned about the investment opportunity with Defendant and TGI through his father, and he made a single loan to TGI in October 2008. He testified that his loan to TGI is his sole experience loaning money for profit. In order to fund the loan, he took out a line of credit against a couple of his rental properties. As of the time of trial, the resulting debt had not yet been fully satisfied, despite that some payments had been made. Like Butch and Carl, Hugh does not possess a FFL, and he is not engaged in the firearms business.

**B. TGI's Relevant Business Operations**

During the relevant time period, TGI was purchasing firearms and/or firearms parts from formerly Soviet bloc countries, including primarily Hungary, through ARMACO Trading, Ltd. According to Defendant, ARMACO, located in Budapest, was a licensed seller of weapons that had previously been used in the service of the Hungarian Ministry of Defense. ARMACO would bid with the Hungarian government to purchase and export the weapons. After a winning bid, ARMACO would acquire the weapons from the government. Sometimes ARMACO would contract with FEG, a Hungarian licensed arms manufacturer, which would manipulate the weapons into firearms or parts that were importable into the United States under highly regulated permits. TGI would obtain the necessary permits and import the FEG-manipulated materials into the United States, sometimes in ready-to-sell condition and sometimes in need of further manipulation by a state-side firearms manufacturer like Waffen Werks. Other times, TGI would purchase non-importable materials from ARMACO and have them shipped to the FTZ[3] for de-militarization by Northwest Imports, Inc. ("NWI"), the operator of the FTZ located in Longview, Washington. Once de-militarized, the importable parts would be shipped to TGI or one of its firearm manufacturers like Waffen Werks. TGI paid NWI and its sister company, TNW Firearms, Inc. (both owned by Tim Bero), for manipulation and storage of weapons received from ARMACO (and other sellers).

### C. Defendant's ATF Problems

In an "Open Letter to Federally Licensed Firearms Importers and Registered Importers of U.S. Munitions Import List Articles" dated July 13, 2005 ("July 2005 ATF Open Letter"), importers were advised the following:

---

[3] As explained by Defendant, the FTZ, a physical warehouse located in the United States, is not technically United States territory, and firearms inventory shipped into a FTZ may not be shipped out of a FTZ without an export permit approved by various federal agencies.

8

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has determined that the language of 18 U.S.C. § 925(d)(3) permits no exceptions that would allow frames, receivers or barrels for otherwise non-importable firearms to be imported into the United States . . . [and would] no longer approve ATF Form 6 applications for importation of any frames, receivers, or barrels for firearms that would be prohibited from importation if assembled.  No exceptions to the statutory language, for example for 'repair or replacement' of existing firearms, will be allowed.

. . . .

Importers are reminded that ATF previously approved permits for non-importable barrels and receivers for repair or replacement only, and this restriction was stamped on the face of the permit.  Importers who import such components for any purpose other than repair or replacement of existing firearms, e.g., for assembly into new firearms, will be exceeding the scope of the import authorization in violation of law.  If ATF determines, through inspection or otherwise, that an importer willfully violates the import provisions of the GCA, the Importer's license is subject to revocation pursuant to 18 U.S.C. § 923(e).

Importers holding approved import permits for non-importable barrels and receivers will receive a letter prior to September 10, 2005, advising them that their permit has been suspended.

This determination affects importers as follows:

1.  IF YOU SUBMIT A NEW APPLICATION TO IMPORT FRAMES, RECEIVERS AND BARRELS ON OR AFTER THE DATE OF THIS LETTER, AND THE PERMIT IS FOR NONSPORTING FIREARMS, SURPLUS MILITARY FIREARMS, OR NATIONAL FIREARMS ACT FIREARMS, ATF WILL DENY YOUR APPLICATION.

2.  IF YOU HAVE SUBMITTED AN APPLICATION TO IMPORT FRAMES, RECEIVERS AND BARRELS THAT HAS NOT YET BEEN DENIED OR APPROVED BY ATF AND THE PERMIT IS FOR NONSPORTING FIREARMS, SURPLUS MILITARY FIREARMS OR NATIONAL FIREARMS ACT FIREARMS, ATF WILL DENY YOUR APPLICATION.

3.  IF YOU ALREADY HOLD AN APPROVED PERMIT TO IMPORT FRAMES, RECEIVERS AND BARRELS "FOR REPAIR OR REPLACEMENT," ATF WILL BE SENDING YOU A LETTER EXPLAINING THAT YOUR PERMIT WILL BE SUSPENDED AFTER SEPTEMBER 10, 2005, AND PROVIDING YOU WITH INFORMATION REGARDING YOUR RIGHT TO SUBMIT ARGUMENTS WHY YOUR PERMIT SHOULD NOT BE REVOKED.

[Trial Ex. 166, Attach. G.]  An Open Letter to Federally Licensed Firearms Importers and

Registered Importers of U.S. Munitions Import List Articles dated November 22, 2005

("November 2005 ATF Open Letter"), further explained the July 2005 ATF Open Letter as

follows:

> In an open letter dated July 13, 2005, licensed and registered importers were
> advised that the provisions of 18 U.S.C. § 925(d)(3) established the standards for
> the importation of firearms and ammunition into the United States.  In particular,
> section 925(d)(3) provides that the Attorney General shall authorize a firearm to
> be imported if it meets several conditions:  (1) it is not defined as a firearm under
> the National Firearms Act (NFA); (2) it is generally recognized to be particularly
> suitable for or readily adaptable to sporting purposes; and (3) it is not a surplus
> military firearm.  However, the subsection further provides that "in any case
> where the Attorney General has not authorized the importation of the firearm
> pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or
> barrel of such firearm which would be prohibited if assembled."

> Importers were further advised that ATF has determined that the language of
> section 925(d)(3) permits no exceptions that would allow the frames, receivers,
> or barrels for otherwise nonimportable firearms to be imported into the United
> States.  As a result, ATF would no longer approve ATF Form 6 import permit
> applications for importation of any frames, receivers, or barrels for firearms that
> would be prohibited from importation if assembled.  No exceptions to the
> statutory language, for example for the repair or replacement of existing firearms,
> will be allowed.

> ATF recognizes that certain firearm barrels may be used to assemble either an
> importable or a nonimportable firearm.  With this fact in mind, ATF believes that
> such 'dual use' barrels would be eligible for importation into the United States
> under section 925(d)(3) for commercial purposes, provided prospective importers
> of such barrels make representations indicating that neither the importer nor
> subsequent purchasers of the barrels will use the barrels to assemble
> nonimportable firearms.  Importers of such barrels must provide sufficient
> information, e.g., specific model designation(s) of the firearm(s) that the barrels
> will be used to assemble, in the "Specific Purpose of Importation" section of the
> ATF Form 6 that would enable ATF personnel to establish that the barrels are
> being imported for the assembly into importable firearms.  If the dual use barrels
> are being imported for resale to third parties, the importer must state in the
> "Specific Purpose of Importation" section of the ATF Form 6 that purchasers have
> been or will be advised that the barrels may only be used for assembly into certain
> importable models and must list the specific models for which the barrels will be
> sold.  Inclusion of a model not known to be sporting may require the submission

of a sample for evaluation to determine if importation of the barrels will be approved.

[Trial Ex. 166, Attach. G.]

Within five months of the November 2005 ATF Open Letter, TGI submitted an Application and Permit for Importation of Firearms Ammunition and Implements of War ("Form 6") to the ATF, the U.S. Department of Commerce, and the U.S. Department of State, seeking to import 815 AMD-65 firearms, 724 AMMS firearms, and 14 PKMS firearms from Hungary to the FTZ ("March 24, 2006 Form 6"). [Trial Ex. 166, Attach. D.]  The March 24, 2006 Form 6, signed by Defendant as president of TGI, was officially disapproved by the ATF on May 11, 2006, because, as explained in a letter from the ATF dated May 12, 2006 (the "May 12, 2006 Denial Letter"), the model of guns to be imported were "defined under Title 26, U.S.C. §5845(b) of the National Firearms Act (NFA) of 1934 as machineguns [and a]s advised in the past, [TGI] must properly identify the firearms [it] wish[es] to import[.]" [*Id.*]  According to the May 12, 2006 Denial Letter, TGI was directed to submit a new Form 6 that properly identified the weapons to be imported.  TGI also was specifically advised:

> Please understand that Title 18 U.S.C. §925(d)(3) generally prohibits the importation of NFA firearms, except pursuant to 5844 of Title 26, U.S.C., which allows the importation of NFA weapons, if the importer establishes that the firearm is being imported:
>
> 1)  for official government use;
>
> 2) for scientific or research purposes; or
>
> 3)  solely for testing or use as a model by a registered manufacturer or solely for use as a sample by a registered importer or registered dealer, with the proper documentation as required under 27 CFR 479.105(d).

[*Id.*]

One year later, on May 17, 2007, Defendant and TGI submitted a Form 6 for 39,637

"AMD-65 parts kits, without receiver with dual use SA2000M[4] barrels" (the "May 17, 2007

Form 6"). [*Id.*]  These parts kits[5] were identified as "implements of war" on the May 17, 2007

Form 6 and shown as manufactured by FEG Arms in Hungary.  They were asserted to be

proposed for import "[f]or the construction of SA2000M sporting rifles or for sale to third parties

who will be advised that the barrels may only be used for the construction of importable

SA2000M sporter rifles." [*Id.*]  This May 17, 2007 Form 6 was disapproved on October 12,

2007, by a letter (the "October 2007 Disapproval Letter") that set out the chronology of an

exchange of information between TGI and the ATF concerning the May 17, 2007 Form 6:

> This letter is in regards to permit #07-04297 which involves a request to import
> 39,637 AMD-65 parts kits, to include barrels, from Hungary.  A memorandum
> completed by Mark Barnes and Associates, dated February 14, 2007, was attached
> to your application.  This memo states that you are submitting this application under
> the "Dual Use Barrel Doctrine."  The memo further stated that in March 2006, ATF
> clarified its position on the dual use barrels and that ATF can approve importation
> permits for dual use barrels when the application is supported by information
> sufficient to show the barrels will be used by the importer to assemble firearms that
> would otherwise qualify for importation under 18 USC 925(d)(3).   Section
> 925(d)(3) explains that firearms are not eligible to be imported if they are National
> Firearms Act firearms, surplus military firearms, or firearms not generally
> recognized to be particularly suitable for or readily adaptable to sporting purposes.
> Lastly, the memo stated that the evidentiary basis for approval of these part kits is
> well-founded and that the barrels included are either new or surplus prison guard
> equipment but that none are surplus military or paramilitary.
>
> The evidence that was submitted with the application included a declaration signed
> by Maj. Gen. Eng. Dr. Tibor Gaspar, Commander of HDF IL SC.  This declaration
> was dated May 15, 2007, and stated that the 39,637 pieces of 7.62 mm AMD-65
> assault rifles offered for sale had been the property of the disbanded Civil Forces
> and were newly manufactured by FEG Small Arms Factory.  The declaration
> further stated that the Civil Forces were volunteers and had nothing to do with the

---

[4] Defendant explained that the SA2000M – a "semi-automatic 2000 modified" rifle – is an approved sporting version
of the AMD-65, a fully automatic AK-type rifle.  The AMD-65 is not importable into the United States except when
the importer has a contract to sell the rifles to government or law enforcement or for dealer samples.

[5] A parts kit includes all parts of a gun with the exception of the receiver.  According to Defendant, the receiver is the
main part of the firearm, bears the serial number for the firearm, and is "controlled" by regulation.

military, but had been directly commanded by the Hungarian Socialist Party. Lastly, the declaration said that the Socialist Party collapsed, that the Civilian Forces were disbanded, and that the AMD-65 assault rifles were stored in Ministry of Defense (MoD) custody.

After your application and supporting documentation were reviewed, a letter was sent to you, dated June 26, 2007. This letter requested additional information in order to get this issue resolved. Under 18 USC 925(d)(3), ATF still needed to determine if these defense articles had ever been under the control or possession of a military force. This situation is different than most in that these defense articles, according to your supporting documentation, had been possessed by a "Civilian Force" in Hungary and had at one time been stored in Ministry of Defense (MoD) storage facilities. In order to clarify this issue, ATF asked that you address several questions concerning the history and purpose of the Civilian Force, the history and title of the AMD-65 assault rifles and for more information on the placement of the assault rifles in MoD storage.

On July 19, 2007, the Imports Branch received an email from Mark Barnes and Associates that included a response to ATF's June 28th letter. The response letter was written by Armaco Trading, Ltd., the foreign seller of the AMD-65's. In the letter, Armaco provides ATF with a history of the Civilian Forces in Hungary to include the fact that they were also know[n] as the "Worker's Militia." The letter also explained the history and title of the AMD-65 assault rifles as well as the MoD storage of the assault rifles.

ATF has read all supporting documentation submitted with application #07-04297, to include the translation of the Hungarian documents. ATF has determined that the AMD-65 parts kits with barrels are not importable pursuant to 925(d)(3). Thus, permit application #07-04297 has been disapproved.

[*Id.*]

By 2009, following the 2008 national election, the ATF had instituted stronger regulations and imposed restrictions designed to make it more difficult to get permits to import, manufacture, and sell weapons. Additionally, to better regulate the industry, beginning in 2003 (after the ATF was moved from the Department of the Treasury to the Department of Justice), the ATF routinely conducted annual compliance inspections of FFL holders. ATF inspections of TGI usually occurred between August and October of each year. Through the inspections, which were conducted by approximately fifteen agents and took approximately thirty days, the ATF

performed a number of reviews such as comparing the company's inventory with its books, checking serial numbers on weaponry in the company's possession, and categorizing inventory by origination and destination locations.

The ATF's annual inspection of TGI for 2009 commenced on October 23. [*See* Trial Ex. 166, Attach. E, Verified Compl. for Forfeiture, Case No. 3:10-cv-228, ¶ 15.c.]  As a result of the 2009 annual inspection, the ATF discovered compliance issues and seized from TGI thousands of firearms, as well as notebooks, computers, and business records.  Specifically, between November 25 and November 27, 2009, the ATF executed search warrants at TGI's Louisville location and seized 3,527 rifles and 1,005 parts kits – including 1,166 AK-74 rifles, 1,968 AMD-65 rifles, 5 SA2000M rifles, 116 model AK-74 machinegun barrels with firearm parts kits, and 889 model AMD-65 machinegun barrels with firearm parts kits.  [*See* Trial Ex. 166, Attach. E.]  On December 1, the ATF seized from TGI's Alcoa location an additional 402 AMD-65 rifles.  [*See id.*]  Finally, on December 12, 2009, the ATF seized from the FTZ additional TGI inventory of 547 semi-automatic rifles, consisting of 149 SA2000M rifles and 398 AK-74 rifles. [*See* Trial Ex. 239.]  The rifles in the FTZ were owned by TGI but in the possession of NWI.[6] [*See id.*]

Four years after the ATF raids, in connection with a guilty plea by Defendant [Trial Ex. 216], the United States filed an Information, alleging the following:

> [Defendant] did willfully and knowingly enter and introduce, and attempt to enter and introduce, into the commerce of the United States, imported merchandise, that is, military surplus machinegun barrels and firearms, by means of false statements and by means of false and fraudulent invoices, declarations, affidavits and certain other papers, to wit, Bureau of Alcohol, Tobacco, Firearms and Explosives Forms 6 and Forms 6A, which documents the defendant knew to be false and fraudulent in that they did not accurately reflect the country of manufacture and country of

---

[6] Defendant testified that it was his understanding that the guns seized from the FTZ were functioning firearms.  He also testified that it is his belief that the firearms seized from the warehouse in Alcoa had been in the warehouse during the annual compliance inspections conducted by the ATF in 2007 and 2008.  Keith Cash testified that, notwithstanding that Waffen Werks was holding components and firearms from TGI at the time of the seizures, the ATF never raided the Waffen Werks facility.

origin of the military surplus machinegun barrels and firearms, in violation of Title 18, United States Code, Section 542.

[Trial Ex. 215.]  In his Plea Agreement with the ATF, Defendant pleaded guilty and admitted that he imported goods by false statements. [Trial Ex. 216.]  Specifically, the Plea Agreement stated the following facts:

In 2006, the defendant, acting by and through the Federal firearms licensee (FFL) Tennessee Guns International, Inc. (hereinafter, "TGI"), a corporate entity located in Louisville, Tennessee, in which the defendant serves as owner and president, sought to import from Hungary several thousand firearm parts kits, which included firearm barrels.  The defendant identified the barrels as originating from machineguns previously in Hungarian military stores.  ATF denied the defendant's request to import the firearm barrels pursuant to 18 U.S.C. § 925(d)(3), which prohibits the importation of any firearm frame, receiver, or barrel of an NFA firearm or surplus military firearm.[7]

In an effort to circumvent ATF's denial of the importation of the firearm parts kits, the defendant hired a foreign corporation, ARMACO Trading, Ltd. to disassemble the machineguns previously in military stores and assemble semiautomatic rifles using the surplus military machinegun barrels.  The defendant, without identifying the previously unapproved barrels on an ATF Form 6 or ATF Form 6A, filed documents seeking approval for importation of several thousand completed, "sporting" firearms.  Because the ATF Form 6 and ATF Form 6A submitted by the defendant through TGI did not properly identify the origin or prior status of the barrels, ATF and CBP [the U.S. Customs and Border Protection] approved the completed firearms with surplus military, machinegun barrels for importation.  The completed firearms were imported into the U.S. and introduced into commerce through sales by TGI to customers.

Later, the defendant hired Northwest Imports, Inc., a company that operates a Foreign Trade Zone (FTZ) in Oregon, to perform manufacturing work.  The defendant filed ATF Form 6 documents with ATF to import the machineguns from Hungary for the stated purpose of sales to law enforcement and government.  Upon approval by ATF, the defendant imported Hungarian surplus military, machineguns into the FTZ of Northwest Imports, Inc.  The defendant then shipped semiautomatic, firearm receivers from TGI out to the FTZ in Oregon where workers of Northwest Imports, Inc. assembled the receivers into more complete firearms using the surplus military, machinegun barrels.  The defendant then filed documents with ATF to import the assembled firearm into the United States without properly identifying, as required, the country of origin of the barrels or their status as prohibited barrels under 18 U.S.C. Section 925(d)(3).  The firearms and prohibited

---

[7] Presumably, this paragraph refers to the March 24, 2006 Form 6 and May 12, 2006 Denial Letter.

barrels passed through Customs and entered into the United States, where they were received by the defendant's business. There, the prohibited barrels and other parts were removed for use in assembling complete firearms, and the used receivers were returned to the FTZ to be reused with other barrels. Proper identification of the surplus military, machinegun barrels would have resulted in the denial of the defendant' [*sic*] request to import the firearms.

Initially, the defendant utilized approximately 300 sporting firearm receivers imported from Hungary to bring barrels from the FTZ into the United States. The serial numbers of the initial 300 receivers were altered each time to allow the defendant's ATF Form 6A to reflect a "new" firearm for importation. However, at some point the defendant contracted with NoDak Spud, LLC (NoDak Spud), a domestic FFL, to purchase firearm receivers capable of being fitted to the prohibited machinegun barrels. The defendant then shipped the domestically manufactured NoDak Spud firearm receivers into the FTZ where Northwest Imports, Inc. employees assembled firearms using the prohibited machineguns barrels. On ATF Forms 6 and 6A, the defendant fraudulently declared to ATF and CBP that the firearms and firearm barrels had been manufactured in Hungary, despite the fact that the defendant was at all times aware that the firearms were manufactured in Edina, Minnesota by NoDak Spud. Furthermore the defendant failed to properly identify on ATF Forms 6 and 6A[8] that the barrels were prohibited by 18 U.S.C. § 925(d)(3), having been previously advised by ATF that importation of the barrels was prohibited.

The defendant's proper identification of the origin of firearm barrels would have resulted in denial by ATF and the U.S. Customs and Border Protection of the request to import them.

[Trial Ex. 216, pp. 2-3.]

Defendant still insists that the ATF applied to him a novel interpretation of its regulations to mean that barrels that were once part of a machinegun were not importable under the principle "once a machinegun, always a machinegun." Nonetheless, Defendant pleaded guilty, and his plea resulted in entry of a criminal judgment against him on March 31, 2014, by which he was placed on probation for one year and ordered to pay a $100.00 penalty and to perform 100 hours of community service. [Trial Ex. 219.] Defendant also was banned from possessing any

---

[8] The record does not contain the Forms 6 or Forms 6A that were the offending, false documents referenced in the Plea Agreement.

firearms, and he had to resign from TGI and MPI and divest himself of ownership in MPI as part

of his Plea Agreement.  He also agreed to the civil forfeiture of the seized firearms, parts kits,

and barrels.  [*See* Trial Ex. 216, ¶ 12.]

### D. The Financing Agreements

1. <u>Initial Loans to TGI by Plaintiffs</u>

According to Defendant, the gun importation and manufacturing industry can be volatile

such that many national banks[9] do not lend money to gun dealers or importers.[10]  Specifically,

the gun business is seasonal and generally is based on a number of contingencies, including

weather, holidays, hunting seasons, regulations, negative public events involving firearms such

as mass or school shootings, and election cycles.  Prices likewise affect the market.  As a result,

Defendant, on behalf of TGI, sought non-traditional sources of financing with individuals who

were interested in a high rate of return based on significantly higher interest rates compared to

traditional lending, and approximately 50% of TGI's financing came from private investors.[11]  In

2005, Plaintiffs Carl Lansden and Butch Cash began loaning money to TGI and MPI through

loans negotiated by Defendant.  [*See, e.g.,* Trial Exs. 5, 39, 73, 190.]  Between June 27, 2005,

and July 24, 2009, Carl Lansden loaned TGI a total of $2,478,982.16. [*See* Trial Ex. 39.]

Between September 9, 2005, and August 28, 2008, Butch Cash loaned TGI a total of

---

[9] Defendant testified that local banks were more receptive to lending to TGI, and TGI had a banking relationship with Home Federal Bank before 2007.

[10] The Defendant testified that these difficulties were exacerbated by and financing became even more difficult to obtain after the September 11, 2001 terrorist attacks.

[11] For example, in addition to Plaintiffs, TGI also obtained loans from an investor named Johnny Walker totaling $284,100.00 at the rate of 36% interest. [*See* Trial Ex. 213.]  Plaintiffs loaned funds to TGI at 25% interest because they understood from Keith that 25% was the going industry rate.

$366,817.97. [*See* Trial Ex. 5.]  On October 9, 2008, Hugh Lansden loaned TGI $290,000.00.

[*See* Trial Exs. 1, 3.][12]

## 2. Loans by Citizens

In September 2007, Defendant[13] began a relationship with Citizens, which loaned him

$3,400,000.00 to purchase a 50.5-acre farm adjacent to his residence "and to consolidate debt."

[Trial Exs. 65, 251.]  Simultaneously, Citizens also loaned $1,500,000.00 to Defendant "to

establish a business operating line of credit." [*Id.*]  As reflected in the proof of claim filed by

Citizens in Defendant's bankruptcy case [*see* Trial Ex. 65], Defendant initially executed

promissory notes dated September 27, 2007, in the principal amounts of $3,400,000.00 and

$1,500,000.00.  [Trial Ex. 65.]  The line of credit was renewed numerous times through April 30,

2013.  [*Id.*]  Included within the "Major Terms and Conditions" of the September 12, 2007

commitment letter was a requirement for TGI and MPI to serve as guarantors, and Defendant

executed guaranties on behalf of both corporations when the loans were closed and at other times

through April 30, 2013. [Trial Exs. 176G, 176H, 251.]   Citizens loaned Defendant an additional

$730,000.00 under a Master Promissory Note (Pursuant to Revolving Credit Agreement) on

February 20, 2008. [Trial Exs. 177A, 177D.]

All of the debt owed by Defendant to Citizens was cross-collateralized, guaranteed by

TGI and MPI, and secured by Defendant's residential real property and the inventory of TGI, as

reflected in the respective security agreements [Trial Exs. 175A – D, 176A – L, 177A – L, 177O]

and UCC-1 statements filed by Citizens in December 2008. [Trial Exs. 68, 187, 188.]  Defendant

---

[12] Between June 22, 2005, and December 11, 2008, Defendant, individually, and jointly with his wife, Holly Scarlett, also entered into forty-one loan agreements by which they loaned more than $4.3 million to TGI, all of which was repaid in full by TGI by March 30, 2012. [*See* Trial Ex. 211.]  Defendant acknowledged that many of his loans to TGI were funded by proceeds of loans he obtained from Citizens.

[13] Although the initial commitment letter was issued by Citizens to Defendant and his wife [Trial Ex. 251], only Defendant executed the notes.

testified that "it was his understanding" that the lien granted to Citizens on TGI's inventory

simply served as a "back-up" to the real property lien up to the amount of $730,000.00 and

because he was not required to contact Citizens when inventory was sold in the ordinary course,

he did not consider the debt he owed to Citizens to be an actual encumbrance against TGI's

inventory.

### E. Default and the Resulting ISDA

According to Defendant, by mid-2009, following the inauguration of President Barack

Obama, assault rifle sales drastically decreased, leaving TGI, MPI, and Defendant unable to

service their respective debt obligations, including those to Plaintiffs.  On October 5 and 6, 2009,

Defendant refinanced several loans in the total principal amount of $1,255,370.57 owed to Carl

Lansden. [Trial Ex. 190.]  One month later, Butch Cash notified Defendant that he could no

longer renew any existing loans with maturity dates of November 30, 2009.  [Trial Ex. 191.]

Within a few days of the November 27, 2009 ATF raid and seizure of TGI inventory,

Plaintiffs went to the TGI facility and met with Defendant in person to find out what had

happened.  The loan agreements between TGI and Plaintiffs provided that loan proceeds were to

be used to purchase specifically identified inventory and that repayment would occur

immediately on the sale of such inventory to TGI's customers or, regardless of customer

payment for the inventory, within a certain period of time (usually within six months) after the

loan originated.  When Plaintiffs questioned Defendant about the ATF seizure, Defendant

assured Plaintiffs that the seized property would be returned and could be sold to satisfy the

debts owed to Plaintiffs.  Defendant also asked for and received a two-month moratorium on

accrual of interest.[14]

---

[14] Interestingly, on December 18, 2009, Defendant's legal counsel wrote an opinion letter to Defendant in response to
his inquiry about whether 25% interest was usurious under Tennessee law.

In mid-December 2009, Defendant met with Carl Lansden and Keith Cash at the TGI facility to discuss the outstanding loan obligations and how to proceed. Within a day or two of that meeting, Waffen Werks received certain inventory from TGI, and Keith and Defendant signed a receipt on December 22, reflecting the following "collateral" was picked up by Waffen Werks with the value (not stated in the receipt) to be applied against the money owed to Carl Lansden: (1) Finnish P-08 (13 pieces); (2) FPK parts kits (447 pieces); and FPK 7.62x54R receivers (859 pieces).[15] [Trial Ex. 132.]

Also in December, Carl was advised by Keith that the VAT applicable to TGI's materials in Hungary was due. ARMACO was required to pay a value-add tax ("VAT") of 25% of the value of the firearms when it contracted with FEG to manipulate the weapons. The VAT was refunded by the Hungarian government when the materials were exported. For much of the relevant time period, FEG was making regular shipments to or on behalf of TGI so that ARMACO was willing to pay the VAT and receive the refund after the materials were exported. After TGI's business started declining in 2009, however, in early September 2009, TGI directed ARMACO to hold off on planned shipments and also asked ARMACO to loan TGI funds for the last 2,500 of 20,000 SA2000M rifles that were being manipulated by FEG. [*See* Trial Exs. 82, 83, 121, 122, 123, 124.] ARMACO eventually agreed to a short-term (six-month) loan at 25% interest but also demanded that TGI pay interest on the VAT payments made by ARMACO for materials that were not being shipped on the agreed schedule. [*See* Trial Exs. 84, 85, 86, 87, 125.]

---

[15] These items were included within but did not constitute all of the items listed on Exhibit B to the ISDA. [*See* Trial Ex. 2, Ex. B.]

During the discussions between ARMACO and TGI about the short-term loan, FEG gave notice to ARMACO that without payment from TGI for the 2,500 SA2000M rifles, and without a firm order for the remaining 10,000 pieces, FEG would have to close the factory and lay off its workers. [Trial Ex. 86.] After the ATF seizure, Defendant notified ARMACO that TGI would not be able to import the SA2000M rifles with original AMD-65 barrels because the ATF had deemed the AMD-65 barrels to be machinegun barrels. [Trial Ex. 88.] In response, ARMACO demanded immediate payment of the refundable VAT, which totaled $60,653.39, and interest of $10,107.23 on the short-term loan. [*See* Trial Exs. 89, 92, 93, 94.]

After Defendant mentioned to Carl that the VAT was due in Hungary and that failure to make the payment could result in loss of 12,500 firearms, Carl agreed to help, and he contributed approximately $70,750.62, which was paid to ARMACO by Waffen Werks. [Trial Exs. 90, 91, 133.] Apparently, Carl (if not Butch and Hugh) and Defendant began negotiations then for an inventory-for-debt swap as evidenced by Defendant's December 28, 2009 letter to ARMACO concerning the payment by Waffen Werks, which reflects that TGI was "in the process of transferring ownership of a yet to be determined portion of the 10,000pcs [*sic*] of dismounted AMD's stored at FEG to Waffen Works." [Trial Ex. 90.] Carl testified that he had no idea at the time of the VAT payment that $10,097.23 of the total he contributed for the VAT was not for the VAT but, instead, was for interest on a short-term loan that TGI owed to ARMACO.[16]

---

[16] Notably, $60,653.39 was the amount of the VAT referenced as having been paid by Carl Lansden to ARMACO in the January 6 Memorandum of Understanding between TGI and Butch Cash as well as the January 26 Memorandum of Understanding between TGI and Carl Lansden "in order to secure products currently in their [ARMACO's] possession at the FEG facility in Hungary to satisfy the terms of this MOU," both discussed *infra*. [Trial Exs. 62, 249.] Additionally, TGI wrote to ARMACO on January 11, 2010, and referenced an "oversight" concerning the payment by Waffen Werks of both the VAT and the interest payment, which "was to come from TGI not Waffen Werks." [Trial Ex. 95, p. 2.] On March 5, 2010, however, Erin Taylor with Waffen Werks sent a letter to Carl Lansden enclosing the ARMACO invoices and indicating that the sum of $70,752.62 was paid to ARMACO on December 22, 2009, "for VAT taxes on your property, 2,500 SA20000M single action sporting rifles." [Trial Ex. 133.]

Defendant's December 28 letter to ARMACO also reported that the "ownership transfer [to Waffen Werks] will involve some several thousand units[, and u]pon the transfer, Waffen Werks will become responsible for the costs regarding this sub set [*sic*] of AMD's." [Trial Ex. 90.]  Defendant also advised that "[t]he remaining quantity of dismounted AMD-65 and the 2,500 pcs of SA2000M are still our property [and w]e consider the agreements between TGI and ARMACO to still be valid in regards to the loan on the 2,500 pcs of SA2000M and for ARMACO's commission." [*Id.*]

Defendant and TGI's financial troubles that existed at the time of, but were significantly exacerbated by, the ATF seizures continued into 2010, and on January 6, 2010,[17] Butch Cash and TGI entered into a memorandum of understanding ("January 6 MOU") about the repayment of financing agreements having a principal balance of $208,469.59.  The January 6 MOU stated that "[a]s of November 25th, 2009 the lender agrees that no new interest or penalties will accrue on any principal balances due." [Trial Ex. 62.]  The January 6 MOU also references a debt-for-inventory swap and identifies the inventory as "located at TGI, FEG factory in Hungary and FTZ # 120 in Washington State."  The document also includes the following provision:  "The total principal due will be assessed a 10% premium of $20,846.96 to cover the associated extra costs in the importation and ultimate sale of the inventory in the U.S."  [*Id.*]  Finally, as relevant here, the January 6 MOU required TGI to issue sales invoices/vendor credits to Waffen Werks for 110% of the total principal balance owed in order to transfer the ownership of the inventory to Waffen Werks, and such invoicing and acceptance of the inventory by Waffen Werks would

---

[17] Although it was not signed by Butch Cash until January 12, 2010, the January 6 MOU is dated "1/6/2010" at the top right corner of each page and was signed by Defendant, on behalf of TGI, on January 6, 2010. [Trial Ex. 62.]  For that reason, the Court considers the date of that particular Memorandum of Understanding to be January 6, 2010.

"effect payment of the balances due and the lender will issue a statement that their respective loans have been paid in full and that TGI is released from all obligations." [Trial Ex. 62.]

Similarly, TGI and Carl Lansden entered into a memorandum of understanding dated January 26, 2010[18] ("January 26 MOU") for a debt-for-inventory swap relating to the debt TGI owed to Carl. [Trial Ex. 249.]  The January 26 MOU sets forth the principal balance owed of $1,344,847.80. [*Id.*]  The January 26 MOU contains all of the same terms as the January 6 MOU. [*See* Trial Exs. 62, 249.]

Notwithstanding the January 6 and January 26 MOUs, which were the culmination of negotiations concerning the outstanding debt obligations owed to Plaintiffs by TGI, through a number of drafts and revisions [*see, e.g.*, Trial Exs. 202, 245], the parties entered into the ISDA on April 29, 2010. [Trial Ex. 2.]  The ISDA served to satisfy TGI's debts owed to Plaintiffs in the aggregate amount of $1,856,269.70 as of November 25, 2009.  TGI agreed to the following conditions that are relevant to resolution of this adversary proceeding:

> This Inventory in Satisfaction of Debt Agreement (the "Agreement") is being entered into by and between T G INTERNATIONAL, INC. (hereinafter referred to as "TGI") and CARL LANSDEN, CARL H. LANSDEN, and ROBERT H. CASH (each such person hereinafter called a "Lender Constituent" and all Lender Constituents hereinafter collectively referred to as "Lender") related to the repayment of prior "Finance Agreements" which are listed upon the Details of Finance Agreements, Inventories and Values attached hereto and made a part hereof as <u>Exhibit A</u>.
>
> . . . .
>
> WHEREAS since November 25, 2009 additional interest and penalties have continued to accrue pursuant to the aforementioned "Finance Agreements" but the Lender has agreed to waive all of the same in consideration of this Agreement; and

---

[18] Although it was not signed by Carl Lansden until April 28, 2010, the January 26 MOU is dated "1/26/2010" at the top right corner of each page and was signed by Defendant, on behalf of TGI, on January 26, 2010. [Trial Ex. 249.] For that reason, the Court considers the date of that particular MOU to be January 26, 2010.

WHEREAS TGI currently owns unencumbered inventory that is located in locations owned, leased or rented to or borrowed by TGI, the Free Trade Zone (hereinafter "FTZ") #120 in the state of Washington and in Hungary at the ARMACO Facility; and

WHEREAS, the parties desire that TGI fully satisfy all of its obligations to Lender pursuant to the Finance Agreements through the payments and deliveries of unencumbered inventories of TGI to Lender as further set out herein below.

NOW, THEREFORE, for good and sufficient consideration, the parties hereto, intending to be legally bound, do mutually covenant, contract, and agree as follows:

1. TGI agrees to transfer ownership of all of the goods and inventory listed on Exhibit D and Exhibit E to this Agreement (the "TGI Inventory") that it owns which are located in locations owned, leased or rented to or borrowed by TGI, the FTZ #120 in the state of Washington and in Hungary at the ARMACO Facility to Lender and Lender agrees to accept repayment of the outstanding principal, interest and penalties due, cumulatively to date on all of the Finance Agreements listed on Exhibit A as "Balance", such repayment to be made solely to TGI transferring to Lender the aforementioned TGI Inventory.  Lender does furthermore acknowledge and agree that no further accruals of penalties, interest or other charges of any sort shall arise with respect to the Finance Agreements beyond amounts recited upon Exhibit A hereto; provided, however, that lender shall nevertheless be entitled to receive and recover from TGI a premium, in the form of additional inventory of TGI (the "TGI Premium Inventory"), as liquidated damages and as a partial offset to additional expenses Lender is expected to incur with respect to portions of the TGI Inventory and the TGI Premium Inventory, said TGI Premium Inventory being valued at $185,626.97 according to "TGI Costs" as defined at paragraph 4. hereof. Lender acknowledges that it has received "title, equity and ownership", as defined at paragraph 2. hereof, of a portion of the TGI Inventory prior to the date hereof according to invoices of TGI totaling $282,242.65 attached hereto and made a part hereof by this reference as Exhibit B (the "Delivered TGI Inventory") and Lender Constituents Carl Lansden and Carl H. Lansden do furthermore acknowledge that they have received the cash payments, totaling $28,541.73, against their respective Finance Agreements as indicated on the instrument captioned "Cash Payments Made to Carl Lansden, Carl H. Lansden & Robert Cash After 11/25/09" which is attached hereto and made a part hereof by this reference as Exhibit C.  Lender, finally, is to receive the remaining TGI Inventory as listed upon:  (a) Invoice 40432 from the location in Hungary at the ARMACO Facility (copy attached as Exhibit D) and (b) Invoice 40433 from the FTZ #120 in the state of Washington (copy attached as Exhibit E.[)]

2.  TGI shall only receive credit toward its debt to Lender when title, equity and ownership of the TGI Inventory remaining in TGI's possession or control vests to Lender free and clear from the claims of any person, entity or other creditor.  When title, equity and ownership of all of the TGI Inventory and all of the TGI Premium

Inventory shall be delivered to Lender, each of the Lender Constituents shall, and by these presents does, upon their own behalf and for and with respect to anyone claiming by or through them, release and forever discharge Lenders, Carl Lansden, Carl H. Lansden, Robert Cash, TGI, its officers, directors and constituents, specifically including without limitation, Charles M. Jones, III (such persons and entities thereby discharged herein collectively called, "Dischargees"), from all damages, costs, expenses, liabilities and other obligations of any type or sort with respect to each and all of the Finance Agreements.

3.  Title, equity, and ownership of the goods vest only when all of the following occur:

    (a)  The goods are successful imported from FTZ #120 and ARMACO in Hungary via an approved ATF Form 6 import application.

    (b)  The goods are fully and freely released from Customs and Border Protection's custody to the below named importer of Lender's choosing.

4.  It is agreed that the value of the goods to be credited against the debt owed will be calculated based on the actual purchase price paid by TGI for said item, plus any ocean/air transport, duties, broker fees, manufacturing, disassembly, storage, commissions, insurance and excise taxes incurred by TGI on the TGI Inventory (collectively, the "TGI Costs"), provided, however, that storage costs for the TGI Inventory arising from November 25, 2009, until approval of the ATF Form 6 application on behalf of Lender or Lender's importer named herein below shall be the sole responsibility of TGI and TGI shall reimburse Lender for such storage costs either in cash or in additional unencumbered inventory of TGI upon receipt of Lender's notice and documentation regarding the same.    Satisfactory documentation of the TGI Costs has been provided by TGI to Lenders contemporaneously with this Agreement and Lenders hereby acknowledge receipt of the same.

5.  Lender is hereby nominating and TGI is hereby acknowledging said nomination of Waffen Werks, an appropriately licensed importer located at 5914 Edmonson Road, Knoxville, Tennessee 37918 as Lender's importer for all items included in this agreement.

6.  Waffen Werks, or any subsequently named importer, shall be responsible for importing, preparing all imported items for sale in the United States and disposing of said items in a lawful manner to end users.

7.  It is understood by and between the parties that Waffen Werks, as the Lender's nominee under this contract, has a fiduciary duty and responsibility solely to Lender.

8.  Upon signature of this agreement, TGI shall within twenty-four (24) hours of the execution of this agreement contact the ATF imports branch and request that all ATF Form 6 applications seeking to import the goods at issue be "returned without action".

. . . .

11.  Should either party incur any expense or legal fees in a successful effort to enforce any portion of this Agreement following the breach or default by another party to this Agreement, the parties agree that any court of competent jurisdiction shall award reasonable attorney's fees and suit expenses which are reasonably incurred to the non-defaulting party.

[Trial Ex. 2.]

The ISDA was executed by each Plaintiff individually and by Defendant "Individually and for T G International, Inc." [*Id.*, pp. 5-6.]  The final version of the ISDA was prepared by Defendant's[19] attorney, Stephen Moseley, and executed at his office.  Moseley testified that he received the initial draft of the ISDA from either Defendant or his sister on April 21, and he made the revisions reflected in the red-lined version, including adding "individually" to Defendant's signature line as well as the portion of the ISDA that released Defendant from personal liability once "title, equity and ownership" of the inventory had been transferred. [*See* Trial Ex. 202.]

## 1. ARMACO Inventory

According to Exhibit D to the ISDA, which is a copy of Invoice #40432 dated January 27, 2010, addressed to Waffen Werks from TGI, Plaintiffs were to receive 10,000 AMD-65 parts kits, each having an agreed-upon value[20] of $61.50, computing to a total value of $615,000.00 (the "ARMACO Inventory").  [*Id.*, Ex. D.]  Exhibit D reflects that the ARMACO Inventory was

---

[19] Moseley testified that he had represented TGI and Defendant for approximately thirty years.

[20] Plaintiffs asked Keith Cash to evaluate the value of the inventory included in the ISDA because of his knowledge of the industry.  Carl Lansden testified that he was satisfied with Keith's assessment of the value of the inventory in the ISDA.

located at the ARMACO facility in Hungary and identifies it as "collateral" for Plaintiffs' loans to TGI. [*Id.*]  Exhibit D also reflects the following:  "[v]alue to be applied against loan principle per agreement reached 12/21/09." [*Id.*]

Although the ISDA expressly stated three times that the inventory was unencumbered, ARMACO made it clear to Defendant on February 19 and March 9, 2010, that there were outstanding invoices owed by TGI.[21] [Trial Exs. 77, 97; *see also* Trial Ex. 96.]  Indeed, financial problems relating to the ARMACO Inventory predated the ATF raid.  Defendant and TGI were making late payments to ARMACO in May 2009, as reflected in emails, messages, and letters. [*See* Trial Exs. 80, 81, 82, 121.]  On October 20, 2009, ARMACO notified TGI that the entire project would collapse if TGI did not pay for the four shipments, referencing a fax sent on October 19 and an offer for financing even though the price for the loan was high. [Trial Ex. 123.]  When TGI did not make a payment, ARMACO notified Defendant on October 21 that it was canceling the order and stopping delivery by FEG. [Trial Ex. 122.]  TGI continued negotiations with ARMACO in the fall of 2009, seeking financing and additional time. [*See, e.g.*, Trial Exs. 83, 84, 85, 124, 125.]

The situation with ARMACO escalated, and on November 10, 2009, ARMACO sent an email to Defendant marked "Top Urgent!!!!", advising that because FEG had not received TGI's payment for the 2500 SA2000M weapons or a firm order for the remaining 10,000 AMD units, FEG would terminate activity and lay off workers on November 11, 2009; and all of the goods currently being held by ARMACO would have to be placed in guarded storage for which

---

[21] ARMACO informed Defendant on February 19 that "TG can take delivery of these goods as soon as the invoices are paid." [Trial Ex. 77.]  In the March 9 communication, ARMACO remained concerned about TGI's indication that the inventory would be transferred to Waffen Werks, with which ARMACO had no relationship:  "Once you have paid for these goods we can deliver them to TG only, independent from your decision that once the goods were in the US territory legally, you may share the ownership with [the] other US company."  [Trial Ex. 97.]

ARMACO would invoice TGI. [Trial Ex. 86.]  This was followed two days later by a fax from

ARMACO to Defendant, advising that "[i]t is unprecedented and unacceptable the behavior you

are handling the critical SA2000M issue.  Our faxes of key importance are not responded, our

calls on the phone are not answered, your due transfers in USD for enabling us due deliveries are

not effected, after all of these our cooperation becomes disputable." [Trial Ex. 194 (*sic*

throughout).]

Several months later, when ARMACO did not receive payment after its March 9 letter,

ARMACO emailed Defendant again on April 20, demanding payment. [*See* Trial Ex. 98.]  This

demand came only nine days before execution of the ISDA, and it, in connection with the many

communications with ARMACO in the months and days leading up to April 29, 2010, make it

clear that ARMACO did not intend to release any of the inventory until commissions and fees

were paid.

Additionally, approximately seven weeks before the ISDA was executed, on March 8,

2010, Defendant renewed the $730,000.00 "inventory line of credit" with Citizens, including the

"blanket lien on assets" of TGI and MPI. [Trial Ex. 177B.]  Given Defendant's business

background and experience, as well as the number of loans he was a party to over the years, the

Court finds disingenuous Defendant's testimony that he did not consider the ARMACO

Inventory to be encumbered by the Citizens lien.

## 2. FTZ Inventory

In addition to the ARMACO Inventory, Plaintiffs were to receive specific inventory (a

total of 12,800 items) located in the FTZ (the "FTZ Inventory") with a collective agreed-upon

value of $1,128,627.93. [Trial Ex. 2, Ex. E.]  The FTZ Inventory is listed on Exhibit E to the

ISDA, which is a copy of Invoice #40443 dated January 28, 2010, addressed to Waffen Werks

from TGI.  Exhibit E also identifies the FTZ Inventory as "collateral" and references an

agreement reached on December 21, 2009. [*Id.*]

Despite the ISDA's description of the FTZ Inventory as unencumbered, on April 2, 2010,

NWI's owner, Tim Bero (the operator of the FTZ), signed a Chattel Lien Notice, which was

recorded in Washington on April 13, 2010, asserting a $275,000.00 claim against the inventory

for a debt by TGI. [Trial Ex. 214.][22]  Although Defendant claims that he was unaware of the lien

until after the ISDA was signed (and the record supports that Defendant did not receive a copy of

the Chattel Lien Notice until after May 21, 2010 [Trial Ex. 129]), on February 23, 2010, Tim

Bero wrote to Defendant to provide storage invoices for November 2009 and January and

February 2010, indicating that an inventory report for all TGI property in the FTZ would be

available for review only after payment of the storage invoices. [Trial Ex. 149.]  Moreover, on

April 15 – a mere two weeks before the ISDA was signed – Tim Bero's wife wrote to Defendant

as follows:

> It has come to our attention that you are in the process of turning over the entire
> AK type inventory, located in [FTZ] #120, site 1, over to Waffen Works [*sic*].
>
> Please be advised that Northwest Imports cannot release any items from the zone
> until all open invoices, including any storage and attorney fees associated with this
> merchandise, are paid in full.

[Trial Ex. 150.]

Additionally, as with the ARMACO Inventory, the FTZ Inventory was subject to

Citizens' lien, renewed by Defendant on March 8, 2010, covering all of TGI's inventory.  [Trial

---

[22] NWI subsequently recorded a second Chattel Lien Notice on September 14, 2010, claiming a lien on "Rifles, Pistols, Barrels, and/or Receivers – Lots 2006-01, 2007-01, 2009-03, 2009-04, 2009-09, 2009-11, 2009-12, 2009-13, 2009-14, 2009-15, 2009-17, 2009-18, 2009-19, 2009-20, 2009-21, and 2009-22 [the "Goods"] owed by TG International, Inc. for the sum of $200,000.00 for and on account of labor, skill and material expended upon the Goods which was completed through the 26th day of August 2010." [Trial Ex. 214.]

Ex. 177B.]  Thus, Defendant's representation in the ISDA that the FTZ Inventory was

unencumbered was false.

### 3. Delivered TGI Inventory

In addition to the ARMACO Inventory and the FTZ Inventory, the ISDA also transferred

to Plaintiffs inventory located in Knoxville.  [Trial Ex. 2, Ex. B.]  Exhibit B to the ISDA,

consisting of a document entitled Delivered TGI Inventory, identified a total of 19,207 assorted

firearms, kits, sets, and accessories that, according to the ISDA, had been delivered to Plaintiffs

prior to execution of the ISDA on April 29, 2010.  [*Id.*]  It is undisputed that, at the time it was

executed on April 29, 2010, Plaintiffs were in possession of the Delivered TGI Inventory listed

on Exhibit B to the ISDA,[23] with the exception of the accessories.[24]  Plaintiffs subsequently sold

the Delivered TGI Inventory for less than they anticipated it would be worth.

### 4. Premium Inventory

Under paragraph 1 of the ISDA, Plaintiffs were "entitled to receive and recover from TGI

a premium, in the form of additional inventory of TGI (the 'TGI Premium Inventory'), as

liquidated damages and as a partial offset to additional expenses Lender is expected to incur with

respect to portions of the TGI Inventory and the TGI Premium Inventory, said TGI Premium

Inventory being valued at $185,626.97 according to 'TGI Costs' as defined at paragraph 4."[25]

---

[23] The first three items on Exhibit B are the same items reflected on the receipt signed by Defendant and Keith Cash dated December 22, 2009.  [*Compare* Trial Ex. 2, Ex. B, *with* Trial Ex. 132.]

[24] Carl Lansden testified that he was informed the day before he signed the ISDA that there were no accessories included with the FTZ Inventory, and Butch Cash testified that he also was told that there were no accessories but that he understood they were missing only from the Delivered TGI Inventory, not the FTZ Inventory.  Butch also testified that Defendant rejected Butch's requested description of the inventory as "whole and complete."

[25] Paragraph 4 defines the "TGI Costs" as "any ocean/air transport, duties, broker fees, manufacturing, disassembly, storage, commissions, insurance and excise taxes incurred by TGI on the TGI Inventory." [Trial Ex. 2, ¶ 4.] Paragraph 4 also expressly states that "storage costs for the TGI Inventory arising from November 25, 2009, until approval of the ATF Form 6 application on behalf of Lender or Lender's importer . . . shall be the sole responsibility of TGI and TGI shall reimburse Lender for such storage costs either in cash or in additional unencumbered inventory of TGI upon receipt of Lender's notice and documentation regarding the same." [Trial Ex. 2.]

[Trial Ex. 2, ¶ 1.]  Plaintiffs assert that the TGI Premium Inventory consisted of 2,500 additional

firearms (SA2000M rifles) located in Hungary; however, the exact weapons were not expressly

listed in the ISDA or its exhibits.  Defendant disagrees with Plaintiffs and argues that the 2,500

additional firearms were not connected to the Premium Inventory.  Defendant asserts that the

Premium Inventory was included in the inventory transferred by the ISDA as 10% of the loan

values at the time, as evidenced by Exhibit A to the ISDA, which is a balance sheet reflecting the

amount of the debt owed to Plaintiffs, including a "10% up charge"; the value of the inventory

identified in Exhibits B, D, and E; and the amount of cash payments made by TGI to Carl and

Hugh Lansden between November 29, 2009, and execution of the ISDA.  The problem with

Defendant's argument is that it ignores the plain language of the ISDA:

> Lender does furthermore acknowledge and agree that no further accruals of
> penalties, interest or other charges of any sort shall arise with respect to the Finance
> Agreements *beyond amounts recited upon* <u>*Exhibit A*</u> *hereto*; ***provided, however, that
> lender shall nevertheless be entitled to receive and recover from TGI a premium,
> in the form of additional inventory of TGI (the "TGI Premium Inventory")***, as
> liquidated damages and as a partial offset to additional expenses Lender is expected
> to incur with respect to portions of the TGI Inventory and the TGI Premium
> Inventory, said TGI Premium Inventory being valued at $185,626.97 according to
> "TGI Costs" as defined at paragraph 4. hereof.

[Trial Ex. 2, ¶ 1 (emphases added).]  That is, the ISDA clearly (1) defines the inventory shown

on Exhibits D and E as the "TGI Inventory" and (2) expressly references Exhibit A (on which

appears a "10% up charge," the amount of which is included in inventory being transferred that

is identified in Exhibits B, D, and E) as not affecting Plaintiffs' entitlement "to receive and

recover from TGI a premium, in the form of *additional inventory* of TGI (the 'TGI Premium

Inventory'), *as liquidated damages and as a partial offset to additional expenses*" Plaintiffs were

expected to incur.  [Trial Ex. 2, ¶ 1 (emphasis added).]  Thus, the only reasonable interpretation

---

31

of paragraph 1 of the ISDA is that the inventory values identified on Exhibit A (*i.e.,* the

inventory identified on Exhibits B, D, and E) do not include the TGI Premium Inventory.[26]

Other than setting the value of the TGI Premium Inventory at $185,626.97 (which is 10% of the

principal and interest due to Plaintiffs as of November 25, 2009), the ISDA is silent as to

specifics of the TGI Premium Inventory.[27]

### F. Post-ISDA Activities

#### 1. ARMACO Inventory

After execution of the ISDA, Defendant sent a fax on May 4, 2010, to ARMACO

advising, *inter alia*, the following:

> Due to our ongoing delay in shipments resulting form [*sic*] our BATF's refusal to
> allow the import of the SA2000M program we have been forced to sign an
> Inventory in Satisfaction of Debt Agreement with one of our private lender groups.
>
> This agreement has transferred the ownership of the 10,000 pcs of dismounted
> AMD-65 to the lender.  The lender has nominated and TGI accepted the nomination
> of the company Waffen Werks to be the licensed importer for these goods.  Waffen
> Werks is now responsible for the importing and preparing of the goods for sale into
> the U.S.  The lender is now responsible for all ocean/air transport, Customs duties,
> broker fees, manufacturing, disassembly, storage, commissions, insurance and
> excise taxes incurred by TGI to date for these 10,000 pcs of dismounted AMD-65
> along with future expenses.[28]

---

[26] The Court also notes that the language at issue was added by Defendant's counsel. [*See* Trial. Ex. 202.]  Thus, the provision, to the extent it is ambiguous, must be construed against Defendant. *See German v. Ford*, 300 S.W.3d 692, 704 (Tenn. Ct. App. 2009).

[27] Nor do the precursors to the ISDA, the January 6 and January 26 MOUs, shed any light on the TGI Premium Inventory except that both MOUs refer to an agreement that "Waffen Werks will import, at TGI's request, any remaining or 'surplus' inventory from FEG factory in Hungary and or FTZ #120 [for which] TGI will pre pay all costs related to the importation of any 'surplus' inventory." [Trial Exs. 62, 249.]

[28] This sentence appears to directly contradict paragraph 4 of the ISDA, which provides that the value of the inventory to be credited against the debt owed included "the actual purchase price paid by TGI for said item, plus any ocean/air transport, duties, broker fees, manufacturing, disassembly, storage, commissions, insurance and excise taxes incurred by TGI on the TGI Inventory" and that "storage costs for the TGI Inventory arising from November 25, 2009, until approval of that ATF Form 6 application on behalf of Lender or Lender's importer . . . shall be the sole responsibility of TGI."  [Trial Ex. 2, ¶ 4.]

This agreement requires TGI to request that all ATF Form 6 applications pending or approved relating to the 10,000 pcs of AMD-65 and their related left over parts under FEG's current care be returned without action.   Waffen Werks is now responsible for obtaining these approvals for importation.

. . . .

It is our understanding that Waffen Werks and the lender wish to continue to work with FEG and ARMACO under the same terms, pricing and conditions to move forward with the SA2000M program with these 10,000 pcs.  At this time the lender and Waffen Werks are intensely focused on the approval of the necessary permits and the ultimate goal of successful completion of the SA2000M program and removal of the goods from FEG.

The terms of this Agreement were forced upon us over the course of a single day[29] and I regret we were not able to seek your counsel and input on this very important subject. . . .

[Trial Ex. 195; Trial Ex. 276.]

For the ARMACO Inventory, Waffen Werks filed its first Form 6 application on June 7, 2010, seeking to import 3,237 AMD-65 parts kits (*i.e.,* without barrels).  Keith Cash testified that, in his attempts to get the ARMACO Inventory and in response to his family's request that he go and negotiate a resolution, he made three or four trips to Europe to talk with the chairman of ARMACO, beginning in February or March 2010 – before execution of the ISDA.  Plaintiffs all testified that they understood that the only costs they would need to pay to have the inventory shipped from Hungary would be air freight, which except for the fact that ocean/air transport was included, seems to comport with the ISDA provision that the inventory value included "the actual purchase price paid by TGI . . . , plus any ocean/air transport, duties, broker fees, *manufacturing, disassembly*, storage, commissions, insurance and excise taxes incurred by TGI on the TGI Inventory." [Trial Ex. 2, ¶ 4 (emphasis added).]  Keith, however, testified that he understood that a demilitarization cost of $7.20 per weapon on the 10,000 pieces would need to

---

[29] Notably, the record establishes that this statement by Defendant is false.

be paid because TGI had not paid it.  Defendant also testified that the demilling cost per rifle was

$7.20, but he indicated that the demilling cost was included in the price of the rifle when it

shipped.  In any event, sometime later, Keith learned that in addition to demilling costs of $7.20

per unit, ARMACO was claiming that TGI also owed storage and guardian fees totaling

approximately $250,000.00.

On June 14, 2010, ARMACO faxed a letter to Waffen Werks, addressed to Keith,

referencing a June 8 message "detailing TG unpaid invoices, and understanding [Waffen

Werks's] need for some time to determine a course of action." [Trial Ex. 134.]  The letter also

advised:

- Our pre-licence for WW is submitted to our Authority weeks ago.  We expect it back approved within two weeks.  This pre-license will cover AMD-65 parts, part kits and even the SA2000M 7,62x39 mm sporting/hunting rifles, either with original AMD barrel with extension, or with newly made FEG or any other barrels.

- FEG is still studying the restart conditions of barrel production line.  We hope to have a positive answer with their conditions this week.  That time they promised to issue that letter which is required for your BATF paperwork.

- Our final point here relates to the entire project, including 10,000 part kits, 2,500 pcs ready made SA2000M rifles and the other parts already produced by FEG for the project.  All the materials are warehoused at FEG, and because of these are firearms, appropriate guarding is required by law.  FEG is, because of the negligence for payments of TG, for any reason, drifted into a close to bankruptcy state.  There is a danger of FEG collapse and close down, and then the further fate of the goods shall be unknown.  Police or the authority may confiscate of the materials stored there for any reason. TG or WW or ARMACO will lose everything.

Please consider that better to have the situation saved with a capital injection by paying invoices and continue the project, than losing everything already invested in this project, plus losing the materials stored at FEG.

[*Id.* (*sic* throughout).]

Notably, the record reflects that the first time Plaintiffs or their agent were provided information concerning TGI's debt to ARMACO was on June 8, 2010.[30]  ARMACO referenced Keith Cash's "quick answers of 04.06.2010[31]" and went on to say, "Regarding unpaid invoices of TG, for your better understanding the case, we detail here the components of costs."  [Trial Ex. 281.]  The letter then explained the demilling cost of $7.20 for each AMD-65 parts kit, as well as the costs for the already packed 2,500 SA2000M rifles. [*Id.*]  Then, the recent history of TGI and ARMACO's dealings was detailed, including reference to some items that had not yet been invoiced to TGI, including storage of the 2,500 SA2000M rifles (which were not expressly included in the ISDA). [*Id.*]  The Court infers from these documents that Keith and Plaintiffs first learned of TGI's debt to ARMACO in early June 2010.  Indeed, on July 2, 2010, ARMACO wrote to Defendant in response to emails from TGI (which are not in the record) and stated, "Following WW entering in the picture, we had nothing but to advise Mr. Cash about the unpaid invoices of TG.  Here we enclose our fax sent to Mr. Cash in the subject of pending payments on 08 June, 2010."  [Trial Ex. 280.]  That same letter also advised that ARMACO had paid 4,600,000 HUF[32] to FEG "as part of storage costs" in order to stop the electricity from being disconnected and that, without a payment, "the goods cannot be removed from FEG or from Hungary." [Trial Ex. 280.]  The letter continued:

> Having this self explanatory fax [*i.e.,* the June information provided to Waffen Werks about unpaid invoices], WW is slowly stepping back and Mr. Cash is

---

[30] The record, however, is somewhat incomplete because the copy of the communication (which appears to be an email) cuts off the top of the document reflecting the date and the complete email information is cut off on the record copy that is Trial Exhibit 281, which is actually a copy of the letter/email that was faxed from ARMACO to Defendant on July 2, 2010. [Trial Ex. 280.]

[31] It is evident from other ARMACO documents that the date format used by ARMACO's chairman is DD.MM.YYYY with DD being the day, MM being the month, and YYYY being the year.  Thus, the date of 04.06.2010 equates to June 4, 2010.

[32] HUF is the Hungarian currency.

foreseeing the delivery of 500 pcs AMD parts kits monthly, when WW receives the green light from BATF and the instructions how to proceed with the barrels.

Any movement of goods depends on payment.  You are not paying neither the interest, nor the capital of the loan nor our commission, nor the other pending invoices.

How do you suppose we and FEG release the goods to third party without paying for the works already done?

Practically, supposing all payments arranged, we have no licence to deliver the goods to a third country.[33]  If we had, it would come the customs problems, probably now expenses, plus transportation costs.

Instead we propose you to purchase the Romanian barrels, deliver these ready made to us and we perform barrel change.  Please consider this option.

As for the KGPF, 9 mm SA, the sample is ready, your butts installed, please see pictures attached.

The problem is that your proposed price for a stockless barreled action of USD 120,00 per gun is unacceptable to FEG.  For this price and without a financially guaranteed yearly quantity they cannot commit themselves.

They believed to promises and are fed up with good ideas.

Here we are and stressing again, that without payments we cannot move but are headed to a very uncertain future.

[Trial Ex. 280 (*sic* throughout).]

Less than three weeks later, on July 19, ARMACO notified Defendant that the

Hungarian police had seized all of the ARMACO Inventory (as well as the 2,500 SA2000M

rifles and the KGPF sample). [Trial Ex. 101.]  ARMACO's chairman placed the blame

squarely on Defendant:  "Your illadvised [*sic*] managing and non payments led to this

hopeless case which will come to an end together with a huge invoice from the Police."

[*Id.*]  Finally, ARMACO notified Defendant that if the situation was not resolved by

---

[33] The reference to a "third country" relates to TGI's plan to have ARMACO ship inventory to a Romanian barrel manufacturer for removal of the original (non-importable) barrels, installation of the new barrels, re-painting of the rifles, and ultimate export to the United States to TGI.  [*See* Trial Ex. 279.]

September, ARMACO would have no other choice but to actively seek a buyer for the

AMD parts kits and other inventory.  [*Id.*]

In response to ARMACO's July 19 letter, Defendant faxed a letter dated July 20, 2010,

stating:

It is with great displeasure that we read your fax of yesterday concerning the inventory forced on FEG by your Police.  We too have had two such inventories forced upon us during the last six months on our goods, including AMD-65 types, stored in the Customs Free Trade Zone at our expense.

Based on recent comments from our BATF and our Washington, DC attorney, it is now our belief that BATF will never reverse its improper opinion that the original barrels are not importable.  With this knowledge, we are trapped with these 2,500 pcs having paid for the original parts and owing for the build costs to FEG for the original sporter and now having to pay to replace the barrels.  All hope of profit for these is lost.

The only hope we see is the re-barreling of these either by FEG or in Romania and selling them in the U.S. commercial market simply to recover our original capital costs and secure payment for FEG.

Due to the BATF's actions and seizures of our inventory and the forced transfer of inventory to Waffen Werks and the resulting chain reaction of unpleasant financial consequences we find ourselves on a very short capital leash.  It is quite frankly embarrassing for me that TGI cannot even make the smallest of payments at this time.

Our bank is willing to discuss an increase in our line of credit to effect the release of payments to ARMACO and FEG so that 500 pc lots of SA2000M could be re-barreled in Hungary or Romania.  But they are weary of throwing good money after bad.  We have to provide them with the costs of the possible options.

At this time, what we desperately need from FEG is a written price offer to re-barrel the 2,500 pcs in 500 pc lots with newly manufactured Romanian barrels supplied by us that are dimensionally identical to the original AMD-65 barrel.  The Romanians are asking us for a technical drawing of the original AMD-65 barrel to ensure a high quality end product.  Can FEG provide us with this type of drawing from their records?

With these costs in hand, I am confident that our bank will release funds to start this conversion process and bring this program to a positive conclusion once and for all.

[Trial Ex. 102.]

For the remainder of 2010 and into 2011, ARMACO and Plaintiffs (through their agent, Keith Cash), with continued communications also involving Defendant,[34] engaged in extensive dialogue to try to find a workable resolution that would result in importation of the ARMACO Inventory from Hungary, but no agreement was reached because Plaintiffs were unwilling to pay what ARMACO demanded before inventory would be shipped. [*See, e.g.,* Trial Exs. 106, 108, 135, 166, 197, 198, 199, 282, 283, 284.]  With the ARMACO Inventory still in ARMACO's possession, Keith Cash travelled to Hungary in February 2011. [*See* Trial Ex. 260.]  Keith testified that on that trip, he negotiated an agreement, subject to approval of Plaintiffs [*see* Trial Ex. 138], between Waffen Werks and ARMACO.  Keith and ARMACO's chairman signed a document entitled "Minutes of Meeting," in which it was proposed that Waffen Werks would pay a unit price of $134.15 (including fees for conversion, disassembly/demilling, and export packing, together with a commission to ARMACO) for the 10,000 converted AMD-65 firearms into SA2000M rifles with a newly manufactured SA receiver, to be manipulated and shipped in lots of 800 units per month after immediate payment of (1) the original $7.20 per piece demilling cost (a total of $72,000.00) plus (2) $25,000.00 of a total of $100,000.00 for guarding and storage costs. [Trial Ex. 137.]  The proposal also included a cost of $145.69 each for 2,100[35]

---

[34] Notably, in connection with a request to Citizens for a three-month extension on two loans, on August 16, 2010, Defendant communicated with Citizens about TGI's difficulties, explaining that TGI's attorney believed that the ATF had overstepped such that he was working to secure release of the seized inventory.  [Trial Ex. 183.]  (This appears to be contrary, in spirit if not in fact, to what Defendant told ARMACO on July 20 when he said that "[b]ased on recent comments from our BATF and our Washington, DC attorney, it is now our belief that BATF will never reverse its improper opinion that the original barrels are not importable."  [Trial Ex. 102.]  Defendant went on to explain to Citizens that TGI was in the process of shifting its business from primarily manufacturing to importation of surplus firearms and ammunition, referencing a March 2010 contract with a company in Ukraine and a contract with a company in Romania for collectible pistols, as well as a contract with Bulgaria, all of which were anticipated to yield gross profits in the next twelve months of $2,450,000.00 plus gross revenue of $245,000.00. [Trial Ex. 183.]

[35] Presumably, these 2,100 rifles were part of the 2,500 SA2000M rifles that TGI wanted to import and had not expressly included in the TGI Premium Inventory but which Plaintiffs intended as the TGI Premium Inventory referenced in the ISDA.

SA2000M rifles without barrel or stock (calculated at $134.15 plus $11.54 for removal of the

original barrel and repacking).  [*Id.*]

Following an ultimatum from FEG on March 9, 2011, that, *inter alia*, Waffen Werks

must pay $97,000.00 within fourteen days or "FEG put ownership on the 10,000 pcs kits and the

2,500 pcs SA to compensate 27 monthes [*sic*] of storage cost from 1 January, 2008, plus the

executed works," [Trial Ex. 244C], Keith Cash emailed ARMACO that "[m]y family is in

agreement with the 72k for ex-works already performed.  We are also in agreement for the two

payments of 25k each for storage costs.  At this time we are still working on barrel pricing to see

the total cost of the project.  I hope to have that this week[,]" [Trial Ex. 244C.]  The record

reflects no additional communications after the March 9 emails until ARMACO wrote to Keith

on May 25, 2011, referencing the silence on the proposal and making an "immediate payment

demand from FEG" for $72,000.00 for demilling costs plus $50,000.00 for storage expenses.

[Trial Ex. 244D.]  The letter stated that "[t]he condition now is the immediate payment," and [i]f

it would not be done within 5 days, the kits would be transferred to police custody, causing again

extra storage costs, and nobody knows what else, by side of huge losses that we will not bear

surely." [*Id.*]

Following more back and forth, including involvement of an attorney on behalf of

ARMACO making demand under the Minutes of Meeting as an enforceable contract [*see* Trial

Ex. 137], on July 22, 2011, several months after Plaintiffs had filed suit against Defendant in

state court [Trial Ex. 75], Butch Cash took over communications[36] with ARMACO by sending

---

[36] By September 2012, the relationship between Keith and Plaintiffs had deteriorated to the point that Keith threatened criminal charges against his father. [*See* Trial Ex. 30.]  Keith testified that around that same time, he sent the remaining inventory that he held for Plaintiffs to his sister's company "to be done with Plaintiffs."

the following proposal to begin the last round of negotiations for Plaintiffs to secure the

ARMACO Inventory:

> We will make the first payment of $7,200.00 in advance since we trust your word to deliver the first 1,000 AMD-65's. When we receive the first shipment of 1,000 AMD-65's, we will then make an immediate payment of $14,400 in order to secure processing and shipment of the second order of 1,000 AMD-65. This first $14,400.00 payment will totally pay for the first shipment and will pay one half of the cost of the second shipment.

> We will continue this payment/shipment schedule until all 10,000 AMD-65's have been paid for and received by Waffen Werks.

> This arrangement will result in us paying you $144,000.00 in total and you shipping us 10,000 AMD-65's in total, during a ten month period. We are prepared to do this as soon as you desire.

[Trial Ex. 244F.] Within a week, ARMACO declined that offer [*see* Trial Ex. 139], but

communications continued [*see, e.g.,* Trial Exs. 9, 10, 11, 12, 13, 51, 140, 141, 244G, 244H,

244I, 244J, 244K, 244L], until on July 17, 2012, ARMACO sent the following fax to Waffen

Werks, addressed to Butch Cash:

> We are advising you that all the AMD-related materials which were seized by the Hungarian Police as corpus delicti since July 2010, were all liberated in June 2012 and were allowed to transfer the materials to TGI being the legal owner of these goods. This sounds well, but there are some serious problems. During this two years period, due to the unpaid invoices of TGI which originated prior to the Police seizure and still are unpaid, the Factory has gone into bankruptcy.

> The Factory ceased to exist and it is its Liquidator who took over everything found inside the fence: materials and unpaid invoices as well.

> In spite of the fact that the Police allowed TGI to take the goods, it is the Liquidator who has the right of disposal on the materials because and on the right of unpaid invoices of TGI.

> Until full payment for the materials nothing will be given out from the ex-FEG stores and, as a plus, the Liquidator himself will look for prospective buyers very quickly to avoid additional expenses of storage/guarding of the goods and recover the value of the unpaid invoices.

> Technically, as an addition to all aboves, the materials are far from being AMD part kits, only, rather they are parts of firearms as most of them were being modified for SA conversion, additional prefabricated material added physically, unseparably, fire control parts modified for the purpose, not mentioning the magazines which were already delivered to TGI, and the prefabricated materials for continuous production. All these were done before the police seizure.

> Here we are, with our towering losses, and consider it necessary to advise you correctly.

[Trial Ex. 10 (*sic* throughout).]

In the meantime, in March 2011, Citizens again renewed Defendant's debts [Trial Exs. 65, 176I, 176J, 177B, 177G, 177H], and on June 27, 2011, Citizens, through counsel, wrote to FEG to assert a security interest in the ARMACO Inventory transferred to Plaintiffs in the ISDA. [Trial Ex. 201.] The June 27 letter also promised, "the costs of storage and disassembly will very soon be paid to FEG at the price to be agreed upon." [*Id.*] Finally, the letter says that "TGI is ready to accept the 2500 pcs of the SA as soon as ARMACO can receive them, which we understand will be almost immediately." [*Id.*]

It is undisputed that Plaintiffs never received either the ARMACO Inventory or the TGI Premium Inventory.

## 2. FTZ Inventory

The saga of Plaintiffs' efforts to obtain the FTZ Inventory is no less complicated. Because it was encumbered by NWI's chattel lien in the amount of $275,000.00, Plaintiffs were unable to obtain any of the FTZ Inventory without ensuring NWI was paid. In a letter dated May 21, 2010, from NWI's attorneys to counsel for the parties, in addition to enclosing the properly perfected and recorded chattel lien notice, the following points were clearly stated:

> TGI is currently indebted to our client for services rendered and goods provided, in a sum in excess of $221,000. Copies of relevant invoices, the original of which have been delivered to TGI previously are enclosed. Our client's security interest in TGI's goods is held as security for payment and, accordingly, those

41

goods will not be released unless and until acceptable arrangements for payment are made. Additionally those goods are not lawfully importable into the United States without significant modifications. Our client was contracted by TGI to perform such modifications on the goods, including goods previously delivered to TGI, and also goods belonging to TGI that were seized from our client's premises by the Bureau of Alcohol, Tobacco, Firearms and Explosives, under federal search and seizure warrant.

Our client remains ready and willing to perform additional services, to permit the lawful importation of the goods in its possession into the United States, subject to receiving acceptable arrangements for, and guaranties of, payment.

Failing this, however, our client will be forced to take steps necessary to liquidate the inventory, in complete or partial satisfaction of TGI's debt, and in mitigation of our client's contractual damages attributable to TGI's failure to make payments in accordance with its contractual obligations.

[Trial Ex. 129.]

Five days later, Waffen Werks, through Keith Cash, reacted to the May 21 letter by a fax to Defendant and Margaret Lon Britton at TGI concerning the fact that the inventory in the FTZ was not unencumbered to advise TGI that the lien must be removed before Waffen Werks would apply for the Forms 6 necessary for Plaintiffs to import the FTZ Inventory. [Trial Ex. 128.] Keith's letter also directed TGI to cease its attempts to obtain Form 6 permits for the FTZ and ARMACO Inventories and that any pending Form 6 applications must be withdrawn and existing permits must be voided, as required by the ISDA. [*Id.*] The letter gave a deadline of May 28 for resolution, after which Plaintiffs would "pursue these debts without consideration of the equity offered." [*Id.*]

On May 29, 2010, Waffen Werks submitted its first Form 6 for part of the FTZ Inventory. [*See* Trial Ex. 169.] By late July 2010, Waffen Werks had obtained Form 6 approval for 82.5% of the 12,800 items of FTZ Inventory. [*See id.*]

TGI was continuing to do business with NWI, resulting in a reduction of TGI's debt to NWI. On July 16, 2010, Defendant sent a letter to Tim Bero and NWI, advising that "sales of

42

the M-31 9x19mm carbine to J&G Sales seem to be progressing and our outstanding bill with

TNW is being reduced steadily" and "[i]t is our intention to use all of the proceeds from the sales

of M-31 carbines and M-31 parts kits to help pay down TNW/NWI invoices until they are fully

paid.  In addition to these sales we also wish to use the proceeds from the 500 pc Beretta pistols

currently stored in the zone as well as supplementing payments from pending profits to be

collected from other import projects to pay any remaining invoices."[37] [Trial Ex. 112.]

Attempts to resolve the issue, pay off the debt, and release the inventory to Plaintiffs

persisted.  In a letter to Tim Bero dated November 23, 2010, Keith Cash advised that he had just

met with Defendant and that he "strongly suspect[ed] that no agreement w[ould] be reached"

between Plaintiffs and Defendant concerning payment of the outstanding invoices owed to NWI.

Keith requested that Bero "formulate a written proposal to aid in the disposal of [the inventory]

to help NWI as well as [Plaintiffs] recoup as much of their investment as reasonably possible"

and asked that the written proposal include the following:

> Material covered, types and quantities.
> Amounts paid for each type of material.
> Any ancillary costs that we may incur or expect.
> The party responsible for the facilitation of material and funds being dispersed.
> Expected payment schedules and means of payment.
> A plan for any surplus material if not consumed entirely during the course of the transaction.
> What is expected of Waffen Werks/ my family.
> What Waffen Werks and my family should expect in return.
> Anything else that may be important in this transaction.

[Trial Ex. 204.]

Over the next several months, with Plaintiffs' cooperation, NWI sold some of the FTZ

Inventory as well as some of TGI's other inventory to offset a portion of the storage costs, and

---

[37] TGI transferred to Plaintiffs under the ISDA only a portion of the total inventory owned by TGI that was located in the FTZ.  The July 16 letter did not mention Plaintiffs or the FTZ Inventory transferred by the ISDA.

NWI notified Keith Cash on August 10, 2011, that Waffen Werks and NWI had "a $0.00

balance". [Trial Ex. 204.]  By June 2012, the remaining FTZ Inventory had been shipped to

Plaintiffs or their customers [Trial Ex. 248]; however, Hugh Lansden testified that magazines,

scopes, and cleaners that should have been included in the inventory they received were missing.

### G. The State Court Lawsuit, the Bankruptcy Filing, and this Adversary Proceeding

In 2011, Plaintiffs commenced _Lansden et al. v. TG International, Inc., et al_., No.

179780-1, by filing a Verified Complaint for Possession and Money Damages in the Chancery

Court for Knox County, which was amended by the Amended Verified Complaint filed on July

15, 2011 ("Chancery Court Lawsuit") [Trial Exs. 75, 76.]  Through the Chancery Court Lawsuit,

Plaintiffs alleged breach of contract for the original loans and the ISDA, constructive trust,

conversion, unjust enrichment, fraud, and violations of the Tennessee Securities Act and

Tennessee Consumer Protection Act, and they sought imposition of a constructive trust on all

funds loaned by Plaintiffs, including proceeds thereof and property purchased with said funds;

compensatory and punitive damages; actual damages; and attorneys' fees and court costs. [_See

id._]

On March 24, 2014, Defendant filed a Chapter 11 bankruptcy case in order to stop

Citizens from foreclosing on a number of real properties owned by Defendant and his non-filing

spouse.  After Citizens was granted relief from the automatic stay and was authorized to

foreclose on real properties located at 722 Parks Ferry Road, Friendsville, Tennessee; 658 Parks

Ferry Road, Friendsville, Tennessee; Look Rock Crest Drive, Blount County, Tennessee; and

Disco Loop Road, Friendsville, Tennessee, by an Order entered September 24, 2014 [Case No.

3:14-bk-30921-SHB, Doc. 105], the case was converted to Chapter 7 on December 10, 2014.

Defendant received a Chapter 7 discharge three months after conversion.  Neither TGI nor MPI

filed for bankruptcy protection, nor did Defendant's wife because, according to Defendant's

testimony at trial, she was not responsible for Defendant's heavy debt load.

Plaintiffs filed the Complaint initiating this adversary proceeding on August 28, 2014.

The debt on which the adversary proceeding is based is the same debt addressed in the Chancery

Court Lawsuit.  With the Court's permission, Plaintiffs amended the Complaint on July 10, 2015,

to decrease the money judgments sought by each Plaintiff.  On August 24, 2015, Defendant filed

his Answer to the Amended Complaint.

### IV. LAW AND ANALYSIS

#### A.  Dischargeability Generally Under 11 U.S.C. § 523(a)(2)(A)

Under § 523(a)(2)(A), an individual is not discharged from any debt "for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by []

false pretenses, a false representation, or actual fraud, other than a statement respecting the

debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A).  The Court must

construe § 523(a) liberally in favor of Defendant and strictly against Plaintiffs, who bear the

burden of proving each of the necessary elements by a preponderance of the evidence. *See

Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Rembert v. AT&T Universal Card Servs., Inc. (In

re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).  Additionally, as was recently clarified by the

Supreme Court, "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like

fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l.

Elecs, Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).  In summary, to satisfy the requirements of §

523(a)(2)(A), Plaintiffs must prove that Defendant obtained money or property from or

belonging to Plaintiffs through false pretenses and/or material misrepresentations that he knew

were false or that he made with gross recklessness or through actual fraud; that Defendant

intended to deceive Plaintiffs when any such false pretenses and/or misrepresentations occurred

and/or any such fraud occurred; that Plaintiffs justifiably relied on Defendant's false pretenses

and/or representations and/or fraudulent conduct; and that their reliance was the proximate cause

of Plaintiffs' losses. *See, e.g., McDonald v. Morgan (In re Morgan)*, 415 B.R. 644, 649 (Bankr.

E.D. Tenn. 2009).

### B. Initial Financing Agreements

Based on the record, the Court has determined that the question of nondischargeability

centers solely around the negotiation and execution of the ISDA.  It is undisputed that Plaintiffs

were initially introduced to Defendant through Keith Cash because he knew that Plaintiffs were

interested in making investments with high return rates.  From Carl Lansden's and Butch Cash's

first loans to TGI in 2005, their business relationship with Defendant went well until the gun

industry itself began suffering a major decline, thus causing TGI's cash flow to significantly

drop, leaving it unable to satisfy its loan obligations not only to Plaintiffs, but to other lenders

and vendors alike.  Although there is evidence in the record to reflect that Defendant knew that

there were problems with importing AMD-65s and that he was falsifying the Forms 6 submitted

to the ATF as early as 2007,[38] whether there was any sort of misrepresentation, false pretense, or

actual fraud concerning negotiation of the initial loans between Plaintiffs and Defendant is

irrelevant for purposes of this adversary proceeding because all of the past due monies owed to

Plaintiffs under those original loans were restated and, in essence, reaffirmed through the ISDA.

Additionally, the initial financing agreements were between Plaintiffs and TGI, not

Defendant.  Plaintiffs also did not offer any evidence to rebut Defendant's insistence (confirmed

by Grace Phillips) that the ATF re-interpreted its regulations before its inspection and raid in

---

[38] Defendant's Plea Agreement does not reflect a date on which he submitted false Forms 6, but the Information states that the illegal conduct began about June 2007.  [*See* Trial Exs. 215, 216.]

November 2009.  Finally, although Defendant did not raise accord and satisfaction as an affirmative defense, the very title of the ISDA – Inventory *in Satisfaction of Debt* Agreement – establishes that it was intended as an accord and satisfaction of the initial financing agreements.

## C. ISDA

The ISDA, which incorporates the past due sums owed to Plaintiffs from the various loans made to TGI, expressly states that the inventory to be transferred was unencumbered when it was not.  Because the ARMACO and FTZ Inventories were not unencumbered, Plaintiffs were unable to take control of the inventory, which constituted a breach of the parties' agreement. Thus, having determined that the question of nondischargeability centers solely around the negotiation and execution of the ISDA, the Court must determine whether Plaintiffs have satisfied their burden of proof for each element.

### 1. Money/Benefit to Defendant

With respect to the first element, this Court has previously held that a debtor is not required to "directly and personally receive every dollar lost by the creditor" to satisfy the requirements of § 523(a)(2)(A); rather, "'if the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable.'" *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760-61 (Bankr. E.D. Tenn. 2003) (quoting *Metcalfe v. Waters (In re Waters)*, 239 B.R. 893, 901 (Bankr. W.D. Tenn. 1999)); *see also Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996) (affirming the lower court's determination that a debtor "who controlled and was the president of the recipient of creditor's diverted funds" profited from the transfer to sufficiently satisfy the first § 523(a)(2)(A) element).

> Under the "benefits theory" of § 523(a)(2)(A) liability, a debtor may be liable even when he has only indirectly obtained some tangible or intangible financial benefit as a result of his misrepresentation. *See Ash v. Hahn (In re Hahn),* No. 11–3146, 2012 WL 392867, at *4 (Bankr. N.D. Ohio Feb. 6, 2012) (citing *Brady*). Thus, as

found in *Brady,* a debtor who fraudulently induces a loan to a corporation that he
controls may be liable for purposes of § 523(a)(2)(A).

*Vicars v. Freeman (In re Freeman)*, Adv. No. 11-5028, 2013 WL 4447007, at *6 (Bankr. E.D.

Tenn. Aug. 16, 2013).  Accordingly, "a debtor may be liable even when he has only indirectly

obtained some tangible or intangible financial benefit," and even if the facts of a case justify

piercing the corporate veil, a party is not necessarily required to do so in order to satisfy this

element of the dischargeability analysis. *HST Corporate Interiors, LLC v. Sherrick (In re

Sherrick)*, Adv. No. 316-90109; 2017 WL 2889656, at *4 (Bankr. M.D. Tenn. July 5, 2017)

(citations omitted); *see also Norton v. Wilson (In re Wilson)*, No. 2017 WL 1628878, at *5

(Bankr. N.D. Ohio May 1, 2017) (finding that the defendant obtained a financial benefit from a

down payment deposited into an LLC's bank account that was owned and controlled by him and

from which his livelihood was provided and that he received "at least an indirect tangible

financial benefit . . . within the Sixth Circuit's *Brady* analysis[.]").

The Court finds that Defendant unquestionably received a benefit from the ISDA and

rejects his argument that he was required to personally guarantee the ISDA to be liable

thereunder.  First, and most obviously, Defendant received a benefit individually, as well as in

his capacity as owner of TGI, to be expressly released from claims and liabilities by the very

terms of ISDA itself.  Defendant executed the ISDA not only as president of TGI, but

individually [*see* Trial Ex. 2], and it is undisputed that the release of liability and Defendant's

"individual" signature line were added by his attorney, Stephen Moseley. [*See* Trial Ex. 202.]

During his testimony, Defendant stated that he never intended to personally guarantee the ISDA

but only signed in an individual capacity because Carl Lansden did not want Defendant, as

president of TGI, to have the ability to suspend the agreement in the future. The ISDA, however,

expressly provides that upon delivery and transfer of "title, equity and ownership of all of the

48

TGI inventory and all of the TGI Premium Inventory" to Plaintiffs, they agreed to "release and forever discharge . . . TGI, its officers, directors and constituents, specifically and including without limitation, Charles M. Jones, III . . . from all damages, costs, expenses, liabilities and other obligations of any type or sort with respect to each and all of the Finance Agreements," and as with the individual signature line, this language was added by Defendant's attorney of more than thirty years. [*Id.*]

Further, notwithstanding Defendant's contention that he did not personally intend to obligate himself under the ISDA, Plaintiffs each testified that Defendant's individual signature and obligation under the ISDA were a mandatory requirement in their minds, and they would not have agreed to the ISDA had they not believed that both TGI and Defendant, individually, were obligated under the ISDA.  It is also irrelevant that Defendant may not have signed any other of TGI's documents or loans in an individual capacity.  The ISDA was an arrangement between those specific parties, and they were within all rights to negotiate the terms as they chose.

In addition, notwithstanding that the monies to be repaid under the ISDA were initially loans made to TGI, Defendant was the sole shareholder of TGI, and it was the business from which he made his livelihood.  As he testified at trial, Defendant's household expenses in early 2009 were approximately $40,000.00 each month, and he earned enough through TGI to service those obligations.  Once TGI's business began waning significantly (which happened before but was exacerbated by the ATF raid) so that TGI was not earning sufficient income to meet its financial obligations, Defendant likewise could not meet his own personal financial obligations.  More importantly, the record also reflects that Defendant made forty-one loans to TGI of at least $883,000.00 that were not paid in full until after execution of the ISDA, such that it was in Defendant's personal interest for TGI to resolve its financial problems with Plaintiffs, allowing it

to pay its debt obligations to Defendant. [*See supra* note 12.]  One final factor in the benefits-theory analysis is the fact that the very inventory that Defendant transferred to Plaintiffs in the ISDA was also subject to the security interest of Citizens for loans to Defendant, individually. [*See* Trial Exs. 68, 175A – D, 176A – L, 177A – L, 177O, 187, 188.]

Thus, the Court finds ample evidence that Defendant benefited both individually and as owner of TGI by entering into the ISDA with Plaintiffs, and the debt forgiven by Plaintiffs under the ISDA provided a tangible and significant benefit not only to TGI but also to Defendant, thus satisfying the first element of § 523(a)(2)(A) as to all aspects of the ISDA.[39]

### 2. False Pretenses and/or False Misrepresentations and Defendant's Intent

The second and third elements of § 523(a)(2)(A) that must be satisfied are whether the benefit that Defendant obtained by the ISDA was obtained through either false pretenses or material false representations[40] and whether Defendant acted with fraudulent intent through such false pretenses or false representations to induce Plaintiffs to enter into the ISDA.[41]

The Bankruptcy Court for the Eastern District of Michigan recently defined "false pretenses" as follows:

> "A 'false pretense' involves an implied misrepresentation or conduct intended to create or foster a false impression.  A false pretense has been defined to include a 'mute charade,' where the debtor's conduct is designed to convey an impression without oral representation." *Schafer v. Rapp* (*In re Rapp*), 375 B.R. 421, 433 (Bankr. S.D. Ohio 2007) (quotation marks and citation omitted).  It has also been described as "usually, but not always, the product of multiple events, acts or

---

[39] Because the benefit-to-debtor issue is clearly resolved under Sixth Circuit case law such that Defendant may be liable to Plaintiffs, the Court need not reach the issue of whether sufficient evidence was presented to pierce TGI's corporate veil.

[40] Plaintiffs do not argue that there was actual fraud such as a fraudulent conveyance or other "obstructive" type of transfer as discussed in *Husky Int'l. Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) – nor does the record support any such theory.  Rather, Plaintiffs argue that Defendant induced them into signing the ISDA through false pretenses and material misrepresentations.

[41] Although they are separate elements, for the purposes of this adversary proceeding, the Court finds that examining the elements together allows for a more cohesive analysis.

> representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction. . . ." *Evans v. Dunston* (*In re Dunston*), 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part and rev'd in part on other grounds*, 146 B.R. 269 (D. Colo. 1992). The failure to disclose a material fact can form the basis of either a material misrepresentation or false pretense. *See Semaan v. Allied Supermarkets, Inc.*, 951 F.2d 718, 728 (6th Cir. 1991) ("That such deception takes the form of an intentional nondisclosure of a material fact or an implied representation makes no difference."). A debtor's silence may also "create a false impression which would be actionable under § 523(a)(2)(A). . . ." *Brann v. Oxford* (*In re Oxford*), 440 B.R. 772, 777 (Bankr. W.D. Ky. 2010) (citation omitted).

*Lenchner v. Korn (In re Korn)*, 567 B.R. 280, 300–01 (Bankr. E.D. Mich. 2017) (quoting

*Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, 377 (Bankr. E.D. Mich. 2012)). The

bankruptcy court for the Northern District of Georgia also recently broadly defined false

pretenses to include:

> "any intentional fraud or deceit practiced by whatever method in whatever manner[, which] may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive. . . . It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully included by a debtor to transfer property or extend credit to the debtor. . . . Silence or concealment as to a material fact can constitute false pretenses."

*Ga. Dep't of Labor v. Pruitt (In re Pruitt)*, Adv. No. 16-5237-BEM, 2017 WL 3499282, at *2

(Bankr. N.D. Ga. Aug. 14, 2017) (quoting *Taylor v. Wood (In re Wood)*, 245 Fed. App'x 916,

918 (11th Cir. 2007) (citations omitted)); *see also Argento v. Cahill (In re Cahill)*, Adv. No. 15-

08298-reg, 2017 WL 713565, at *6 (Bankr. E.D.N.Y. Feb. 22, 2017) (holding that false

pretenses under § 523(a)(2)(A) "means conscious, deceptive, or misleading conduct calculated to

obtain, or deprive another of property" (citations omitted)).

> In order to establish a debt is nondischargeable as a debt for money obtained by false pretenses, the plaintiffs must establish (1) an implied misrepresentation or conduct by the defendants; (2) promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the

transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs
to advance money, property, or credit to the defendant.

*Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005) (citations

omitted).

In contrast to false pretenses, "[a] false representation has been defined as 'an expressed

misrepresentation.'" *Jennings v. Bodrick (In re Bodrick)*, 509 B.R. 843, 855 (Bankr. S.D. Ohio

2014) (quoting *Wings & Rings, Inc. v. Hoover (In re Hoover)*, 232 B.R. 695, 700 (Bankr. S.D.

Ohio 1999) (citation omitted)); *see also Cody Farms, Inc. v. Deerman (In re Deerman)*, 482 B.R.

344, 367 (Bankr. D.N.M. 2012) (defining false representations as "representations knowingly

and fraudulently made that give rise to the debt" (quoting *Adams County Dep't of Soc. Servs. v.

Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 (Bankr. D. Colo. 2006) (citations

omitted)). "A court can find a false representation if the plaintiff presents proof that the

defendant (1) made a false or misleading statement; (2) with the intent to deceive; and (3) in

order for the plaintiff to turn over money or property to the defendant." *Varble v. Chase (In re

Chase)*, 372 B.R. 133, 137 (Bankr. S.D.N.Y. 2007) (citations omitted). The false statement must

also be material, *i.e.*, it must contain "substantial inaccuracies of the type which would generally

affect a lender's or guarantor's decision . . . [but] is not material if the creditor knows it is false

or possesses information sufficient to call the representation into question." *In re Copeland*, 291

B.R. at 791 (citations and quotation marks omitted). "[T]he test for materiality is not whether

the [creditor] *actually* relied on the false statement, but whether the statement was *capable of

influencing*, or had a natural tendency to influence, the [creditor's] decision." *United States v.

Keefer*, 799 F.2d 1115, 1127 (6th Cir. 1986).

For the purposes of § 523(a)(2)(A), "'[f]alse representations and pretenses encompass

statements that falsely purport to depict current or past facts.'" *In re Copeland*, 291 B.R. at 760

(quoting *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd),* 34 B.R. 633, 635 (Bankr. W.D. Ky.

1983)). Although similar, the two are exclusive causes of action.  "'[A] false pretense' involves

implied misrepresentation or conduct intended to create and foster a false impression, as

distinguished from a 'false representation' which is an express misrepresentation." *Ozburn v.*

*Moore (In re Moore),* 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002) (quoting *Sears Roebuck & Co.*

*v. Faulk (In re Faulk),* 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)).

> Some courts have conflated false representations with false pretenses. *See* 4–532
> Collier on Bankruptcy P 523.08 (16th ed. 2016) (collecting cases).  However the
> two are factually distinguishable: otherwise Congress would have amended the
> statute only to include one or the other. . . . The element distinguishing a false
> representation from a false pretense is an explicit, definable statement by the debtor
> that results in a misrepresentation.  A false pretense, on the other hand is conduct
> by the debtor that implies or promotes a scheme that is misleading.  While most
> times both conduct and explicit statements by the debtor exist, thereby establishing
> a fraud under both false pretenses and false representation, the creditor may be able
> to establish the debtor's conduct without a showing of explicit statements or explicit
> statements without a showing of the debtor's conduct and still be successful under
> § 523(a)(2)(A).

*In re Cahill*, Adv. No. 15-08298-reg, 2017 WL 713565, at *6 (citations omitted).

As for intent, a defendant's fraudulent intent may be "inferred as a matter of fact" based

on the totality of the circumstances, *i.e.*, whether the defendant has engaged in conduct that was

"somewhat blameworthy." *In re Copeland*, 291 B.R. at 759.  In the Sixth Circuit, however, intent

is determined under a subjective standard, *In re Rembert*, 141 F.3d at 281, which "requires that

the trier-of-fact focus solely on the individual characteristics of the debtor . . . [but] still entails

the utilization of circumstantial evidence given that a debtor will rarely, if ever, admit to acting

in a fraudulent manner; helpful in this regard are many of the traditional indicia of fraud." *EDM*

*Mach. Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003)

(citations omitted).

Circumstantial evidence of fraud is sufficient, but the court must have some evidence of the deceit or scheme to find fraudulent intent. *Cash Am. Fin. Servs. v. Fox (In re Fox)*, 370 B.R. 104, 116–17 (B.A.P. 6th Cir. 2007). Badges of fraud from which intent may be inferred include:

> (1) the suspicious timing and chronology of events; (2) a debtor's lack of financial health at the time of the transaction (e.g., insolvency); (3) the failure to keep adequate records; and (4) the existence of unusual transfers.  In utilizing such indicia, however, the Sixth Circuit has cautioned against "factor-counting," instead holding, "[w]hat courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent."

*Weaver v. Vollberg (In re Carlton Mark Vollberg)*, Adv. No. 1:17-ap-01009-SDR, 2017 WL 2787600, at *3 (Bankr. E.D. Tenn. June 27, 2017) (quoting *In re Marroquin*, 441 B.R. 586, 593-94 (Bankr. N.D. Ohio 2010) (internal quotations and citations omitted)).  The intent analysis often comes down to a debtor's conduct before, during, and after the representations at issue and which witnesses are the most credible. *In re Copeland*, 291 B.R. at 766.

The Court concludes from this record that Plaintiffs have offered facts sufficient to prove that, with respect to the ARMACO and FTZ Inventories, the ISDA was entered into under both the broad definition of false pretenses concerning the importability and legality of the inventory as well as the narrower definition of false representations because the inventory was not unencumbered as Defendant affirmatively and expressly represented.  The Court also finds that Defendant acted with fraudulent intent to induce Plaintiffs' execution of the ISDA.

Based on the record before it, and notwithstanding Defendant's testimony to the contrary, the Court finds that when the parties were negotiating the ISDA, Defendant was aware of and made false representations to Plaintiffs concerning the ATF's stance on the importability and resale of the "dual use" firearms with barrels that were previously part of a machinegun.  Hugh Lansden testified that he was never told that any of TGI's Forms 6 had been denied before 2009,

and that after the raid, he and the other plaintiffs went to the TGI facility to meet with Defendant,

who said that he would get all of the seized inventory back.  Similarly, Butch Cash also testified

that he had no knowledge that the ATF had ever denied any of TGI's Forms 6 before the raid.

He also clarified that the ISDA required Defendant to withdraw the pending Forms 6 because of

his trouble with the ATF.  Carl Lansden testified that Defendant explained that the ATF was

taking the position that "once a machinegun, always a machinegun," but that the firearms

pledged as collateral had never been in the military and that the firearms in Hungary were not

machineguns and could be sold whole.

As early as 2006, the ATF had rejected Defendant's Form 6 applications and was advised

by a letter dated October 12, 2007, that:

> [I]n March 2006, ATF clarified its position on the dual use barrels and that ATF
> can approve importation permits for dual use barrels when the application is
> supported by information sufficient to show the barrels will be used by the importer
> to assemble firearms that would otherwise qualify for importation under 18 USC
> 925(d)(3)[, which] explains that firearms are not eligible to be imported if they are
> National Firearms Act firearms, *surplus military firearms*, or firearms not generally
> recognized to be particularly suitable for or readily adaptable to sporting purposes
> . . . .  ATF has read all supporting documentation submitted with application #07-
> 04297 [for firearms at ARMACO] . . . , [and] ATF has determined that the AMD-
> 65 parts kits with barrels are not importable pursuant to 925(d)(3).

[Trial Ex. 166, Attach. D (emphasis added).]  The supporting documentation referenced in the

ATF's rejection letter included a declaration from a Hungarian official explaining that the AMD-

65 assault rifles sought to be imported from Hungary by TGI were never used by any military.

Not only did Carl Lansden testify that Defendant told him that the ARMACO Inventory

had never been in the military, but Butch Cash also testified that during the ISDA negotiations,

Defendant provided to Plaintiffs a copy of the documentation from the Hungarian official that

had been rejected by the ATF in October 2007.  Defendant denies that he gave the

documentation to Plaintiffs.

The record reflects that nearly one month after the ISDA was signed, Defendant wrote to ARMACO asking for a copy of the same Hungarian documentation, saying that "*[m]ost of this documentation was taken from us when the BATF first took our inventories of the SA2000M . . . in November 2009.*" [Trial Ex. 99 (emphasis added).]  Still, given Defendant's continuing assertion that the firearms were importable because they "were owned not by the Army but by the Workers' Militia" [*id.*], and given that Defendant's letter to ARMACO asking for another copy indicated only that "most" of the documentation was taken by ATF, the Court rejects Defendant's denial that he used such a claim – or provided a copy of some of the Hungarian documentation – to convince Plaintiffs that the ATF was wrong and that the ARMACO Inventory was importable.  And, given Defendant's knowledge of the ATF's rejection when he presented the information to Plaintiffs (whether orally or in writing) in an effort to assure them that the ARMACO Inventory would be importable, such was a false representation.

Additionally, notwithstanding his testimony that he did not consider that the debts owed by TGI to Citizens, ARMACO, or NWI constituted any actual encumbrance against TGI's inventory, and that he did not hide the fact that TGI owed money to those entities, as previously stated, the Court also finds that Defendant intentionally and falsely represented to Plaintiffs that the inventory was unencumbered when the record establishes that it was encumbered by the consensual liens of Citizens, the perfected and registered lien of NWI, and the imposed lien of ARMACO.  Defendant's silence concerning the debts owed and the communications he had with Bero and ARMACO that the inventory would not be released until payment was received and his subsequent express representations in the ISDA that the inventory was unencumbered, notwithstanding his knowledge to the contrary, were material misrepresentations made with

fraudulent intent.  Thus, Plaintiffs have met their burden for the second and third elements of a

claim under § 523(a)(2)(A).

### 3.  Justifiable Reliance and Proximate Cause of Loss

The final two elements that Plaintiffs must prove are (A) justifiable reliance; *i.e.*, that

they actually relied on Defendant's representations and, based on the facts and circumstances

that they knew at the time, their reliance was justifiable and (B) that their reliance was the

proximate cause of their losses.[42] *In re Morgan*, 415 B.R. at 649.  As with intent, a court's

determination of whether the plaintiff actually relied and whether the reliance was justified is

subjective, "based on the facts and circumstances surrounding each individual case." *In re*

*Copeland*, 291 B.R. at 766-67.  "To constitute justifiable reliance, the plaintiff's conduct must

not be so utterly unreasonable, in the light of the information apparent to him, that the law may

properly say that his loss is his own responsibility." *Stewart Title Guar. Co. v. Roberts-Dude*,

497 B.R. 143, 151 (S.D. Fla. 2013) (citation, quotation marks, and brackets omitted).  "Under

this standard, a creditor will be found to have justifiably relied on a representation even though

[it] might have ascertained the falsity of the representation had [it] made an investigation."

*Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn.

2001) (citations and quotation marks omitted).

As to the requirement that the reliance be the proximate cause of the loss, "proximate

cause may be established by showing the conduct was a substantial factor in the loss, or the loss

may be reasonably expected to follow." *Sheen Falls Strategies, LLC v. Keane (In re Keane)*, 560

B.R. 475, 489 (Bankr. N.D. Ohio 2016) (citation omitted).  Proximate cause is something more

than what Plaintiffs might have done in a hypothetical circumstance; instead, it "depends on

---

[42] Although these are separate elements, the Court finds that they are more effectively analyzed together.

whether the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible.'" *Allen v. Smith (In re Smith)*, 567 B.R. 529, 539 (Bankr. M.D. Tenn. 2017) (quoting *In re Hermoyian*, 466 B.R. at 370) (citations omitted)).  In other words, "there must be 'a direct link between the alleged fraud and the *creation* of the [liability].'" [43] *In re Copeland*, 291 B.R. at 767 (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 n.7 (1st Cir. 2001)) (emphasis added).

Because the issue of reliance is affected here by differing facts between the ARMACO and FTZ Inventories, the Court will take each category in turn.

<u>ARMACO Inventory</u>

With respect to the ARMACO Inventory, the Court finds that Plaintiffs have met their burden of proof that they actually relied on Defendant's representations, that their reliance was justified, and that it was the proximate cause of their losses.  At trial, each Plaintiff testified credibly that he was told and believed that the ARMACO Inventory was, as reflected in the ISDA itself, unencumbered.  Each Plaintiff also testified that he would not have agreed to the ISDA had he known that the ARMACO Inventory was encumbered in any way or that any of the firearms to be transferred under the ISDA were illegal and/or not importable.

Plaintiffs had a history of loans with TGI:  both Carl Lansden and Butch Cash began loaning TGI money in 2005, and there was a four-year history of timely repayment of loans by TGI before the ATF's seizures.  Additionally, Plaintiffs knew that Keith Cash had been working

---

[43] Defendant made an argument and introduced into evidence a number of exhibits concerning mitigation of damages and whether Plaintiffs could have taken other action to obtain the inventory and/or work other deals.  While the Court will address this in more depth in the damages section *infra*, because Defendant included facts and testimony concerning those efforts in the section of his proposed findings of facts and conclusions of law entitled "Reliance was Proximate Cause of Loss" [*see* Doc. 84, pp. 27-29], because the proximate cause prong examines Defendant's conduct and creation of the liability, such evidence and testimony is irrelevant for purposes of whether there is nondischargeability under § 523(a)(2)(A).

with Defendant for years, and their association with TGI was aiding Waffen Werks, which was
how Keith Cash made his livelihood.

As for the inception of the ISDA, Butch Cash testified that although he believes he
prepared the first draft and was actively involved in the negotiations, the ISDA was Defendant's
idea.  That the ISDA was Defendant's idea was also confirmed by Hugh Lansden's testimony.
Butch Cash also testified that Defendant had neither said nor done anything to lead Plaintiffs to
believe that he was untrustworthy and that neither Defendant nor Keith Cash told Plaintiffs that
money was owed against any of the ARMACO Inventory or that there were any liens or debt
owed on any of the inventory being transferred by the ISDA.[44]  These facts support Plaintiffs'
reasonable expectation that Defendant was trustworthy.

Plaintiffs also were justified in believing Defendant's representations concerning the ATF
and the future ability to import the ARMACO Inventory, especially in light of the Forms 6 that
Defendant provided to Plaintiffs showing approval for importation of the type of items that were
included in the ARMACO Inventory.  Although the Forms 6 later proved to be false, there was
no reason for Plaintiffs to believe that they were anything but valid when they entered into the
ISDA.  Both Butch Cash and Hugh Lansden testified that Defendant did not tell Plaintiffs that
that the ATF had rejected TGI's Form 6 applications before 2009.  Carl Lansden testified that he
was unaware that the barrels being imported by Defendant and TGI were illegal, as did Hugh,

---

[44] Plaintiffs knew that there would be storage costs associated with the ARMACO and FTZ Inventory, but paragraph
4 of the ISDA made such costs the responsibility of TGI, at least until Waffen Werks obtained the Form 6 permits:

> the storage costs for the TGI Inventory arising from November 25, 2009, until approval of the ATF
> Form 6 application on behalf of Lender or Lender's importer named herein below shall be the sole
> responsibility of TGI and TGI shall reimburse Lender for such storage costs either in cash or in
> additional unencumbered inventory of TGI upon receipt of Lender's notice and documentation
> regarding the same.

[Trial Ex. 2, ¶ 4.]  Because of paragraph 4, the Court disagrees with Defendant's argument that Plaintiffs expressly
assumed the risk.

who testified that if he had known that Defendant was importing illegal barrels, he would not

have loaned TGI money.

Concerning whether the ARMACO Inventory was unencumbered, at trial, Keith Cash

testified that he told Plaintiffs that there would be other costs associated with getting the

ARMACO Inventory out of Hungary;[45] however, the Court finds that his testimony concerning

what he – and in turn, Plaintiffs – knew prior to execution of the ISDA with respect to the

ARMACO Inventory was not credible and, in any event, was insufficient to prove that either he

or Plaintiffs knew before April 29 that the ARMACO Inventory was not unencumbered.  First,

Keith's trial testimony during cross-examination by Defendant's counsel, that he became aware

that TGI owed guardian and storage fees to ARMACO before execution of the ISDA, directly

contradicted his deposition testimony a year before trial, when he testified that he was unaware

that any costs were owed on the ARMACO Inventory.  His attempt to provide an adequate

explanation of the discrepancies when Plaintiffs' counsel impeached him at trial was

unpersuasive.  Furthermore, even if Keith was aware before execution of the ISDA that TGI

owed money to ARMACO for storage and guardian fees, there is nothing in the record to

indicate that Keith and/or Plaintiffs would have been aware that ARMACO would not release the

ARMACO Inventory until those fees were paid.  There is, however, documentary proof that

*Defendant* knew that ARMACO would not release the inventory unless TGI made significant

---

[45] This testimony might be based on a misunderstanding because the January 6 and January 26 MOUs reflect an important distinction between the MOUs and the ISDA.  Under the MOUs, Waffen Werks was to be responsible for "bearing any costs associated with the further storage, manipulation or manufacture of the inventory to prepare it for import into the U.S. as well as importation costs, duties, insurance VAT taxes, etc."  [Trial Exs. 62, 249.]  Paragraph 4 of the ISDA, however, provides otherwise.

payments to ARMACO, and as previously discussed, Defendant's failure to so notify Plaintiffs constitutes a material omission and evidence of false pretenses on his part.[46]

### FTZ Inventory

Despite Plaintiffs' testimony that they did not expect to pay storage fees or demilling costs to obtain the FTZ Inventory, there is evidentiary proof that Waffen Werks – and Keith Cash as its owner – were notified in writing that there were other costs being imposed on the FTZ Inventory and it would not be released unless the past due amounts were paid.  The question is whether Keith's knowledge is imputable to Plaintiffs, which is answered by deciding whether Keith was acting as Plaintiffs' agent before the ISDA was executed.  Plaintiffs have insisted that Keith did not become their agent until execution of the ISDA.  Hugh testified that Keith was designated as Plaintiffs' agent right before they executed the ISDA because he possessed a FFL and was highly knowledgeable about importing guns.  Carl testified that Keith was not authorized to act as his agent prior to April 29, 2010, and he expressly denied that Keith possessed the authority to act on his behalf with respect to picking up the firearms reflected in Trial Exhibit 132 on December 22, 2009.  Butch testified that he never told Defendant that Keith could speak for him and never authorized Keith to act as an agent for him before April 29, 2010; that Carl first asked Keith to be Plaintiffs' agent during the meeting held at Moseley's office; and that it seemed like a natural progression for Keith to be Plaintiffs' agent based on his experience, that he had a FFL, and that he had a relationship with Defendant.  The Court, however, disagrees with Plaintiffs' assertions that Keith Cash was not their agent before April 29, 2010.

---

[46] The Court also found it curious that Keith testified that he had spoken with Defendant about this adversary proceeding in the week preceding the initial trial date but he had not spoken with any of the Plaintiffs, including his father, since at least the date of his deposition in August 2015.

"When an agency relationship has been established, the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of the agency." *Creech v. Addington*, 281 S.W.3d 363, 373 (Tenn. 2009); *see also Savage v. City of Memphis*, 464 S.W.3d 326, 333 (Tenn. Ct. App. 2015) ("There are two bases under which the common law attributes the legal consequences of an agent's actions to the principal:  actual authority and apparent authority."). The party seeking to assert agency must prove its existence, as well as the scope and the extent of the agent's real and/or apparent authority through the relevant facts and circumstances. *SecurAmerica Bus. Credit v. Schledwitz*, No. W2012-02605-COA-R3-CV, 2014 WL 1266121, at *17 (Tenn. Ct. App. Mar. 28, 2014).

As to real or actual authority, it "'consists of the powers which a principal directly confers upon an agent or causes or permits him to believe himself to possess . . .' [and] flows from the manifestations of the principal to the agent." *Milliken Group, Inc. v. Hays Nissan, Inc*., 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001) (quoting 2A C.J.S. *Agency* § 146 (1972)). Because it flows from the manifestations of the principal to the agent, actual authority "can therefore be further categorized as either express or implied." *Savage*, 464 S.W.3d at 333 (citing 2A C.J.S. *Agency* § 146 (1972)). "If an agent acts with actual authority, then he may bind the principal in contract regardless of whether the third party is actually aware of that authority at the time of the transaction." *Hays Nissan, Inc*., 86 S.W.3d at 567. Unquestionably, as of April 29, 2010, Keith Cash and his company, Waffen Werks, were designated as Plaintiffs' agents under express terms of the ISDA, and there is no dispute that, as of that date, Keith had actual authority to act on Plaintiffs' behalf. The issue is whether Keith had authority to negotiate and act on Plaintiffs' behalf before execution of the ISDA. Based on the record, the Court finds that he did under principles of apparent authority.

"Even where the principal has not given the agent actual authority to take a certain course of action, the agent may still bind the principal if he had apparent authority." *Savage*, 464 S.W.3d at 333.  Apparent authority has been described as: "(1) such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; (2) such authority as he appears to have by reason of the actual authority he has; or (3) such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Schledwitz*, No. W2012-02605-COA-R3-CV, 2014 WL 1266121, at *18 (citations omitted).  "Apparent authority rests on the principals of estoppel.  If a principal has cloaked an agent with apparent authority to act on behalf of the principal, then the principal is estopped from denying liability for the acts of the agent when the agent exercises that authority." *Dexter Ridge Shopping Ctr., LLC v. Little*, 358 S.W.3d 597, 609 (Tenn. Ct. App. 2010).

> The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority.  The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent.

*In re Estate of Ledford*, 419 S.W.3d 269, 278 (Tenn. Ct. App. 2013) (quoting *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 433 (Tenn. 2008 (emphasis added)).  A principal is not responsible for a putative agent's actions when "only the agent's own conduct has created the appearance of agency." *Little*, 358 S.W.3d at 609.

There is no question that Defendant first became involved with any of Plaintiffs when Butch Cash and Carl Lansden first loaned TGI funds in 2005, solely through Defendant's

connection with Keith Cash.  Keith also was the person who picked up TGI inventory to be

credited to the debt owed to Carl in December 2009, after the ATF raid.  Keith testified that both

Carl and Butch knew that he was taking possession of the inventory identified on a receipt signed

by Keith and Defendant on December 22, 2009.  Carl denied at trial that Keith was authorized to

pick up the inventory items or to sign the receipt, but those same items were listed in the

Delivered TGI Inventory in Exhibit B to the ISDA.[47]  [Trial Exs. 2, Ex. B; 132.]   Also, the

January 6 and January 26 MOUs, although superseded by the ISDA, identify Waffen Werks as

the entity to which ownership of inventory will be effected to repay TGI's debt.  [Trial Exs. 62,

250.]

      Critically, Keith was the middleman between Plaintiffs and Defendant during negotiation

of the ISDA.  As early as December 2009, Defendant was advising ARMACO that TGI was "in

the process of transferring ownership of a yet to be determined portion of the 10,000 pcs of

dismounted AMD's [*sic*] stored at FEG to Waffen Werks." [Trial Ex. 90; *see also* Trial Exs. 92,

95.]  Keith travelled to Germany in March 2010, to meet ARMACO's chairman and answer his

questions about Waffen Werks's ability to obtain the necessary permits so that ARMACO could

obtain the necessary Hungarian permits to export to Waffen Werks.  Moreover, Keith was

intimately involved in the pre-ISDA negotiations such that he and his staff were communicating

directly with Drew Derco and Matt Cook, the attorneys advising and representing Plaintiffs

during those negotiations. [*See, e.g.*, Trial Ex. 245.[48]]

---

[47] The very fact that the ISDA included Delivered TGI Inventory – which already was in the possession of Waffen Werks – shows that Plaintiffs were treating Keith as their agent before execution of the ISDA.

[48] This exhibit is an email dated April 6, 2010, from Drew Derco to Erin Taylor at Waffen Werks, that he sent in response to a telephone conversation the previous day, after "Keith asked that I submit language to guide his family's civil attorney in drafting certain provision of the new, binding legal agreement with TGI." [Trial Ex. 245.]  Derco offered a number of suggestions for language to be included in the ISDA. [*Id.*]  As reflected in the exhibit, Erin Taylor (an employee of Waffen Werks) forwarded the email to Keith on April 7, 2010, with a note "Here is the attorney letter," and Keith, in turn, forwarded it to Butch and Carl with a note saying "Hey guys, this is what we just sent to

Thus, under a totality of the circumstances, it was not unreasonable – in fact, it was entirely reasonable based on Plaintiffs' conduct and acquiescence concerning Keith's involvement – for Defendant and Keith to believe that Keith and, by extension, Waffen Werks, were acting as agents for Plaintiffs before actual agency commenced on April 29, 2010. Critically, it was also reasonable for others dealing with the parties during that time, including Tim Bero and others with NWI, to believe that Keith was Plaintiffs' agent. Why else would Tim Bero's wife send to Waffen Werks a letter on March 31, 2010, attaching the unpaid TGI invoices for storage from January 2010 through April 2010 and the inventory completed by the CBP in connection with the ATF raid? Keith testified that he had communications with Tim Bero about the money owed by TGI, and the March 31 letter supports that testimony ("Mr. Bero requested that I fax the storage invoices . . . . I look forward to working with you in the future."). [Trial Ex. 273.] Despite the express testimony of Butch and Carl that Keith never told them that there was money owed with respect to either the ARMACO or the FTZ Inventory, Keith testified that he did tell Plaintiffs that there was money owed to the FTZ. As referenced above concerning the ARMACO Inventory, the Court does not find Keith's testimony to be particularly credible; however, in this instance, there is documentary proof that Keith, who was at the time Plaintiffs' agent under the doctrine of apparent agency, knew about TGI's debt concerning the FTZ Inventory. Thus, once Keith was notified by NWI about these expenses relating to the FTZ Inventory, no matter the amount, Plaintiffs were on constructive notice to determine the accuracy of the information. As a result, Plaintiffs' reliance on Defendant's representations that the FTZ Inventory was unencumbered was not justifiable.

---

Matt Cook. Please have a look at it and see if you are both comfortable with it or not and let me know either way so that I know wheater [*sic*] or not to have move [*sic*] on it." [*Id.*]

In summary, the Court finds that Plaintiffs have met their burden of proof that they are entitled to a determination of nondischargeability under § 523(a)(2)(A) as to any outstanding amounts attributable to the ARMACO Inventory but have not met their burden of proof with respect to the FTZ Inventory.

## 4. Damages

In the Sixth Circuit, bankruptcy courts possess the jurisdiction and authority to adjudicate the validity of a claim and award damages, "inclusive of compensatory and punitive damages, costs, interest, and attorney's fees" in connection with an adversary proceeding to determine dischargeability. *R & L Pricecorp LLC v. Hall (In re Hall)*, Adv. No. 12-3026, 2013 WL 1739658, at *2 (Bankr. E.D. Tenn. Apr. 23, 2013); *In re Copeland*, 291 B.R. at 792 (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993) (citations omitted)). Plaintiffs claim that Defendant "remains liable for the cumulative amount of $1,276,536.41, plus interest from April 29, 2010, to the date of collection in full, as well as attorney's fees and court costs." [Doc. 83 at ¶ 87.]  To determine the appropriate measure of damages, the Court looks to Tennessee law.[49]

### Damages for Default Under the ISDA

"In a breach of contract action, damages resulting from the breach are a necessary element of the claim and, therefore, the claimant has the burden of proving damages at trial [by a preponderance of the evidence]." *Buttrey v. Holloway's, Inc.*, No. M2011-01335-COA-R3-CV, 2012 WL 6451802, at *7 (Tenn. Ct. App. Dec. 12, 2012).  "The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position [he]

---

[49] Although the Court looks to Tennessee law to determine the measure of damages, all aspects of this adversary proceeding are governed by the Federal Rules of Civil Procedure, as applicable pursuant to the Federal Rules of Bankruptcy Procedure.

would have been in had the contract been performed, but the nonbreaching party is not to be put

in any better position by recovery of damages for the breach of contract than he would have been

if the contract had been fully performed." *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores,*

*Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801

(Tenn. Ct. App. 1993)) ("Generally speaking, damages for breach of contract include only such

as are incidental to or directly caused by the breach and may be reasonably supposed to have

entered into the contemplation of the parties." (quoting *Simmons v. O'Charley's, Inc.*, 914

S.W.2d 895, 903 (Tenn. Ct. App. 1995)).

"Compensatory damages need not be calculated with 'mathematical precision.'  The

damages must, however, be proven with reasonable certainty." *Memphis Light, Gas & Water*

*Div. v. Starkey*, 244 S.W.3d 344, 354 (Tenn. Ct. App. 2007) (quoting *Beaty v. McGraw*, 15

S.W.3d 819, 829 (Tenn. Ct. App. 1998), *abrogated on other ground by Bowen ex rel. v. Arnold*,

502 S.W.3d 102 (Tenn. 2016)).

> "While the amount of damages to be awarded in a given case is not controlled by
> fixed rules of law or mathematical formulas, [ ] the evidence upon which a party
> relies to prove damages must be sufficiently certain to enable the trier of fact, using
> its discretion, to make a fair and reasonable assessment of damages[.]"
> *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006)
> (citing *Overstreet v. Shoney's,* 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999); *Wilson v.*
> *Farmers Chemical Ass'n,* 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969)).  This court
> has held that "'[d]eterminations concerning the amount of damages are factually
> driven.  Thus, the amount of damages to be awarded in a particular case is
> essentially a fact question.  However, the choice of the proper measure of damages
> is a question of law to be decided by the court.'" *Hatchel,* 223 S.W.3d at 228
> (quoting *Beaty v.. McGraw,* 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)).

*Patty v. Lane*, No. E2012-01787-COA-R3CV, 2013 WL 3421928, at *8 (Tenn. Ct. App. July 3,

2013).

By its express terms, the ISDA is a basic inventory-in-exchange-for-debt agreement

between the parties by which Defendant and TGI would transfer and Plaintiffs would receive

inventory that was assigned a certain value as repayment of the debt owed to Plaintiffs by TGI.

Under the ISDA,

1. TGI agrees to transfer ownership of all of the goods and inventory listed on Exhibit D and Exhibit E to this Agreement (the "TGI Inventory") that it owns which are located in locations owned, leased or rented to or borrowed by TGI, the FTZ #120 in the state of Washington and in Hungary at the ARMACO Facility to Lender and Lender agrees to accept repayment of the outstanding principal, interest and penalties due, cumulatively to date on all of the Finance Agreements listed on Exhibit A as "Balance", such repayment to be made solely to TGI transferring to Lender the aforementioned TGI Inventory. Lender does furthermore acknowledge and agree that no further accruals of penalties, interest or other charges of any sort shall arise with respect to the Finance Agreements beyond amounts recited upon Exhibit A hereto; provided, however, that lender shall nevertheless be entitled to receive and recover from TGI a premium, in the form of additional inventory of TGI (the "TGI Premium Inventory"), as liquidated damages and as a partial offset to additional expenses Lender is expected to incur with respect to portions of the TGI Inventory and the TGI Premium Inventory, said TGI Premium Inventory being valued at $185,626.97 according to "TGI Costs" as defined at paragraph 4. hereof. Lender acknowledges that it has received "title, equity and ownership", as defined at paragraph 2. hereof, of a portion of the TGI Inventory prior to the date hereof according to invoices of TGI totaling $282,242.65 attached hereto and made a part hereof by this reference as Exhibit B (the "Delivered TGI Inventory") and Lender Constituents Carl Lansden and Carl H. Lansden do furthermore acknowledge that they have received the cash payments, totaling $28,541.73, against their respective Finance Agreements as indicated on the instrument captioned "Cash Payments Made to Carl Lansden, Carl H. Lansden & Robert Cash After 11/25/09" which is attached hereto and made a part hereof by this reference as Exhibit C. Lender, finally, is to receive the remaining TGI Inventory as listed upon: (a) Invoice 40432 from the location in Hungary at the ARMACO Facility (copy attached as Exhibit D) and (b) Invoice 40433 from the FTZ #120 in the state of Washington (copy attached as Exhibit E.[)]

. . . .

4. It is agreed that the value of the goods to be credited against the debt owed will be calculated based on the actual purchase price paid by TGI for said item, plus any ocean/air transport, duties, broker fees, manufacturing, disassembly, storage, commissions, insurance and excise taxes incurred by TGI on the TGI Inventory . . . provided, however, that storage costs for the TGI Inventory arising from November 25, 2009, until approval of the ATF Form 6 application on behalf of Lender or Lender's importer named herein below shall be the sole responsibility of TGI and TGI shall reimburse Lender for such storage costs either in cash or in additional unencumbered inventory of TGI upon receipt of Lender's notice and documentation regarding the same.

[Trial Ex. 2.]  The value of the respective inventory was agreed to by Plaintiffs and Defendant as reflected in the ISDA:  $282,242.65 for the Delivered TGI Inventory, $615,000.00 for the ARMACO Inventory, $1,128,627.93 for the FTZ Inventory, and $185,626.97 for the Premium Inventory. [*See* Trial Ex. 2, ¶ 1 and Exs. B, D, E.]

At trial, Defendant raised an affirmative defense of mitigation of damages and introduced into the record a good amount of evidence that he argued supported his claim that Plaintiffs did not mitigate.  Plaintiffs objected to Defendant's arguments on the basis that he waived the affirmative defense by not raising it before trial.  The Court decided during trial that because Defendant unquestionably failed to deliver the ARMACO and FTZ Inventories to Plaintiffs, how Plaintiffs sold inventory that they did receive was irrelevant to the issue of damages under a "mitigation" theory.  Defendant sought to offer evidence that Plaintiffs should not be able to recover damages against Defendant because they realized sufficient profit to be credited *toward the debt owed by TGI*.  Defendant's argument misses the point that the ISDA wiped away TGI's debt to Plaintiffs, and the measure of damages sought by Plaintiffs for breach of the ISDA is the value of the inventory promised to be delivered under the ISDA, which value was expressly defined in the ISDA itself.

Because the Court found Defendant's particular mitigation theory to be irrelevant, the Court reserved the issue at trial.  The Court now agrees with Plaintiffs that Defendant waived the affirmative defense of mitigation by failing to raise it in any pleading filed with the Court. Defendant argued that he was not required to plead mitigation because mitigation is not listed in Federal Rule of Civil Procedure 8(c).  [*See* Doc. 84, p. 56.]  Not so.  It matters not that this case is governed by the Federal Rules of Civil Procedure and that Rule 8(c) does not list mitigation of damages as an affirmative defense.  "[B]oth the federal rule and the state rule [concerning the

requirement to plead affirmative defenses] are phrased as being inclusive, and not exhaustive. In

other words, the absence of the [mitigation of damages] defense in the list of various kinds of

defenses that may be asserted to a cause of action does not mean that it should not be considered

as an affirmative defense." *Seaver v. Lindback (In re White)*, 557 B.R. 736, 741 (Bankr. D.

Minn. 2016).  Indeed, despite the fact that Tennessee Rule of Civil Procedure 8.03, concerning

affirmative defenses, does not expressly list mitigation of damages, the Tennessee Court of

Appeals recently confirmed that "[m]itigation of damages is an affirmative defense . . . [that]

must be pleaded . . . or else it is waived." *Aqua-Chem, Inc. v. D & H Mach. Serv., Inc.*, No.

E2015-01818-COA-R3-CV, 2016 WL 6078566, at * 5 (Tenn. Ct. App. May 26, 2016) (citing

*Maness v. Collins*, No. W2008-00941-COA-R3-CV, 2010 WL 4629614, at *11 (Tenn. Ct. App.,

filed Nov. 17, 2010); *Allied Waste N. Amer., Inc. v. Lewis, King, Krieg & Waldrop, P.C.*, 93 F.

Supp. 3d 835, 863 (M.D. Tenn. 2015); *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448,

460 (Tenn. Ct. App. 2009)).  Defendant's failure to raise the issue until the parties developed

their joint statement of issues in the weeks immediately preceding the start of trial constituted a

waiver of the defense, to the extent that it could apply to these facts.

    Although the Court finds it inconsequential[50] because damages related to the FTZ

Inventory are dischargeable, Plaintiffs argue that, although they eventually procured the release

of the FTZ Inventory, they paid $338,000.00 to secure that release and the value of the FTZ

Inventory was reduced in the amount of $319,875.00 for accessories that were missing. [*See*

---

[50] Plaintiffs did not specifically point the Court to record evidence that proves the amounts expended by Plaintiffs to secure the release of the FTZ Inventory or the value of the accessories allegedly missing from the FTZ Inventory. [*See* Doc. 83, ¶ 86.]  Because the Court rules that damages relating to the FTZ Inventory were discharged, the Court has not scoured the record to determine the exact damages relating to the FTZ Inventory but accepts Plaintiffs' assertions.

Doc. 83, ¶ 86.] Such a calculation results in net (dischargeable) damages relating the FTZ Inventory totaling $657,875.00.

Accordingly, Plaintiffs are entitled to an aggregate judgment against Defendant for compensatory damages under the ISDA in the amount of $1,458,501.97,[51] less any payments received by Plaintiffs from TGI, if any, after April 29, 2010. Of the total compensatory damages amount, $800,626.97 – the $615,000.00 value of the ARMACO Inventory and the $185,626.97 value of the Premium TGI Inventory – is nondischargeable under § 523(a)(2)(A), and the remaining $657,875.00, relating to the FTZ Inventory, was discharged on March 16, 2015. Of the total $800,626.97 nondischargeable judgment, $584,457.69 (73%) shall be awarded to Carl Lansden; $128,100.31 (16%) shall be awarded to Hugh Lansden; and $88,068.97 (11%) shall be awarded to Butch Cash. [*See* Doc. 83, ¶ 87.]

## Attorneys' Fees

In addition to compensatory damages, Plaintiffs seek reimbursement of their attorneys' fees incurred as a result of Defendant's default under the ISDA in the total amount of $234,147.22, representing $100,000.00 for the fees and costs paid to John Lucas to prosecute the Chancery Court Lawsuit; $7,000.00 for fees paid to Matthew Cook; and $127,147.22 for fees and costs incurred with Winchester, Sellers, Foster & Steele, P.C. in this adversary proceeding as of September 2016. [Doc. 83, ¶ 88.]

"Tennessee is among the majority of jurisdictions following the 'American rule,' which provides that a party to a civil suit may not recover attorney's fees unless there is either a contractual or statutory provision specifically allowing attorney's fees or some other recognized

---

[51] Damages for breach of the ISDA are calculated as follows: $615,000.00 (the value of the ARMACO Inventory not received by Plaintiffs) + $185,626.97 (the value of the TGI Premium Inventory) + $657,875.00 (relating to the FTZ Inventory).

exception to the rule applies." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 212 (Tenn. 2012)

(citing *Cracker Barrel Old Country Store v. Epperson*, 284 S.W.3d 303, 309 (Tenn. 2009)).

> Here, the ISDA expressly states at paragraph 11:

> Should either party incur any expense or legal fees in a successful effort to enforce any portion of this Agreement following the breach or default by another party to this Agreement, the parties agree that any court of competent jurisdiction shall award reasonable attorney's fees and suit expenses which are reasonably incurred to the non-defaulting party.

[Trial Ex. 2.]  Having found that Plaintiffs are entitled to a judgment against Defendant for compensatory damages, the Court finds that Plaintiffs are also entitled to recovery of their attorneys' fees incurred to enforce the ISDA and that those attorneys' fees are likewise nondischargeable under 11 U.S.C. § 523(a)(2)(A).

Thus, Plaintiffs are entitled to a judgment against Defendant for their attorneys' fees payable to John Lucas in the amount of $100,000.00 for prosecution of the Chancery Court Lawsuit.  Plaintiffs are also entitled to recovery of fees paid to Winchester, Sellers, Foster & Steele, P.C. for prosecution of this adversary proceeding.  Although Plaintiffs stated in their post-trial brief that they had incurred $127,147.22 for the prosecution of this adversary proceeding as of September 2016, there is no proof in the record concerning the amount of fees and expenses related to prosecution of this matter.  Because Defendant should have an opportunity to examine the fee statement and raise any concerns over the reasonableness of the fee, the Court will direct Plaintiffs' counsel to file an affidavit setting forth the fees and expenses incurred in connection with filing and prosecuting this adversary proceeding and will provide Defendant with the opportunity to object within fourteen days, after which the Court will determine the appropriate fee and issue a judgment.

As to Plaintiffs' request for $7,000.00 for fees paid to Matthew Cooke, the record does not prove that such legal fees were for enforcement of the ISDA; instead, the record reflects that those fees were incurred prior to and leading up to execution of the ISDA.  Accordingly, because there is no proof that any fees paid to Matthew Cook were incurred in order to enforce the ISDA, Plaintiffs have failed to prove that they are entitled to a judgment for any of the fees paid or payable to Matthew Cook.

## Punitive Damages

Plaintiffs also seek punitive damages in the amount of $1,000,000.00 against Defendant. [Doc. 83 at ¶ 88.]  Punitive damages generally are unavailable in breach of contract cases; however, under the appropriate circumstances, a court may award punitive damages for particularly egregious conduct. *See Riad v. Erie Ins. Exchange*, 436 S.W.2d 256, 276 (Tenn. Ct. App. 2013).

> Compensatory and punitive damage awards serve vastly different purposes. Compensatory damages are intended to compensate an injured plaintiff for personal injury or property damage and thereby make the plaintiff whole again. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 902 (Tenn. 1992).  In contrast, punitive damages are intended to "punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him." *Huckeby v. Spangler,* 563 S.W.2d 555, 558–59 (Tenn. 1978).  Punitive damages are thus appropriate only in the most egregious cases and, consequently, a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *Hodges,* 833 S.W.2d at 901.  Evidence is clear and convincing when it leaves "no serious or substantial doubt about the correctness of the conclusions drawn." *Id.* at 901 n.3. In other words, the evidence must be such that the truth of the facts asserted be "highly probable." *Teter v. Republic Parking Sys., Inc.,* 181 S.W.3d 330, 341 (Tenn. 2005).

*Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009).

Although the Court has found that Defendant acted with the requisite fraudulent intent to determine that the judgment will be nondischargeable under 11 U.S.C. § 523(a)(2)(A), the Court does not find, based on the record before it, that Plaintiffs have provided clear and convincing

evidence that Defendant's conduct was so egregious that they are entitled to punitive damages against him.  Furthermore, the Court does not believe that Defendant needs additional punishment to deter future similar conduct – imposition of a nondischargeable judgment in the cumulative amount of $800,626.97 plus attorneys' fees likely to exceed $200,000.00 should be a satisfactory deterrent.

## V. CONCLUSION

In summary, because Defendant procured execution of the ISDA with respect to the ARMACO Inventory through false pretenses and misrepresentations, pursuant to 11 U.S.C. § 523(a)(2)(A), Plaintiffs are collectively entitled to a nondischargeable judgment against Defendant in the aggregate amount of $800,626.97 (with Carl Lansden being awarded $584,457.69; Hugh Lansden being awarded $88,068.97; and Butch Cash being awarded $128,100.31), plus attorneys' fees in an amount to be determined.

A Judgment consistent with this Memorandum will be entered.

FILED:  January 26, 2018

BY THE COURT

*/s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE